[Crim. No. 18480. First Dist., Div. Three. Dec. 20, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
EDWARD McCULLOUGH, Defendant and Appellant.

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Clifton R. Jeffers, Chief Assistant State Public Defender, Harriet Wiss Hirsch and Carol Jean Ryan, Deputy State Public Defenders, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Robert R. Granucci and Michael Buzzell, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**FEINBERG, J.**—Appellant was tried and convicted by a jury of being a felon in possession of a gun (Pen. Code, § 12021).[1] He advances before us the following contentions:

---

[1]All section references are to the Penal Code unless otherwise noted.

1.  The trial court abused its discretion by permitting him to be impeached by a prior felony conviction of kidnaping.

2.  The trial court erred in giving an instruction on expert witnesses. (CALJIC No. 2.80 (3d ed. 1970).)[2]

3.  The trial court erred in qualifying an instruction on circumstantial evidence. (CALJIC No. 2.01.)

4.  The trial court erred in its amplification of the "proof beyond a reasonable doubt" instruction. (§ 1096; CALJIC No. 2.90.)

The facts are simple. On February 22, 1978, at about 9 p.m., appellant, driver of an auto, was being cited for a vehicle code violation when one of the two officers involved saw the butt of a revolver protruding from under the driver's seat.

One officer testified that after he had flashed the red light of the patrol car into appellant's car, before the vehicle came to a stop, he saw appellant's right shoulder slip down.

When the revolver was retrieved from appellant's car, it was shown to appellant, whereupon, one officer testified appellant said that the weapon had been fired for target practice on a range and the other officer testified that appellant said, in effect, that he had "just fired it." Soon thereafter, both officers testified appellant denied any knowledge of the weapon.

The weapon, a .38 caliber revolver, was fully loaded with six bullets, four copper-jacketed, hollow-point, Smith and Wesson bullets, one solid lead Spees bullet without copper casing and one solid lead R&P bullet also without copper casing. A search of appellant disclosed a single .38 caliber solid lead R&P bullet without copper casing similar to the R&P bullet found in the revolver.

Appellant stipulated that he had been convicted of rape by force and violence and served a term therefor in state prison.

That was the prosecution's case. It is fair to say that it was a substantial one.

---

[2] All CALJIC instructions referred to are from the third edition (1970) unless otherwise noted.

Appellant was the only witness in his own behalf. He denied having said to the police that the weapon had been fired on a range in target practice, or that he had recently fired the weapon. In fact, he denied any knowledge of the weapon whatsoever.

He admitted that the automobile was his but testified that from about 4 to 5 p.m., February 21, 1978, to about 7:30 p.m., February 22, 1978, he was in custody in the San Francisco jail on some unrelated matter. The prosecution stipulated that the jail records showed that appellant had been taken into custody on February 21, 1978, and had bailed out at 5:17 p.m. February 22, 1978.

Appellant testified that when he was arrested on February 21, 1978, he was in his car with his friend, Joyce, and that upon being taken into custody, he left the car with Joyce. On February 22, 1978, Joyce picked him up at the bail bondsman's office and thereafter appellant drove the car until his arrest on the instant matter. Finally, appellant testified that in the several hours he had been driving his car during the evening of February 22, Joyce and a number of other people had been in his car also.

1. ■ *Was It Error to Permit the Impeachment of Appellant by the Prior Felony Conviction of Kidnaping? (§ 207.)*

*Yes.* ■ *People* v. *Spearman* (1979) 25 Cal.3d 107 [157 Cal.Rptr. 883, 599 P.2d 74], the latest case in the devolution of the rule of law first enunciated in *People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d.1], makes clear beyond cavil, that before the use of a prior felony may be considered for impeachment, i.e., as going to the credibility of the witness, "[it] must involve dishonesty—i.e., it must have as a *necessary* element of the offense the intent to lie, defraud, deceive, steal, etc.—in order to reflect on a witness' credibility." (At p. 114, italics added.)

■ Respondent makes the blank assertion that kidnaping "necessarily involves a dishonest act." As we read section 207, we come to the opposite conclusion; it does *not* necessarily involve fraud, deception or any other act that bears upon veracity.[3]

---

[3]Section 207 provides: "Every person who forcibly steals, takes, or arrests any person in this state, and carries him into another country, state, or county, or into another part of the same county, or who forcibly takes or arrests any person, with a design to take him out of this state, without having established a claim, according to the laws of the

Respondent's argument then is that section 207 in defining kidnaping begins "Every person who forcibly steals, takes, or arrests any person," therefore, kidnaping involves the stealing of a person. Because stealing is an act of dishonesty and, therefore, relates to veracity, it follows that a section 207 kidnaping can be used for impeachment, assuming the other criteria for such use have been met.

The error in the argument arises from the various meanings of the verb "to steal." (See Webster's Third New Internat. Dict. (1966) p. 2232.)

Respondent equates "steals" with the act of committing a *theft*. Of course, that is a correct and perhaps the common use of the word. But it seems clear that the word "steals" was not used in that sense in section 207. Rather, the word was used in the sense of "taking away." In fact, Webster's, *supra,* gives "abduction" and "kidnap" as archaic meanings of "steal." In this connection, we point out that section 207 was originally enacted in 1872 and the language thereof, quoted above, has never been amended.

We are further persuaded because, as a matter of law, one cannot commit the theft of a person. (See § 484.)

Clearly, then, what the relevant portion of section 207 was designed to proscribe was the forcible carrying away of a person. While we are convinced that "steals" as used in section 207 does not mean or imply a theft, we are equally convinced that the Supreme Court, when it said in *Spearman, supra,* that a felony conviction that contained as a necessary element "the intent to lie, defraud, deceive, *steal,* etc." (*People* v. *Spearman, supra,* 25 Cal.3d at p. 114; italics added) did go to credibility, used "steal" in the sense of committing a theft, i.e., a dishonest act.

██ Section 207 proscribes, however, in the alternative, several other courses of conduct, some of which do necessarily involve an act of dishonesty.

United States, or of this state, or who hires, persuades, entices, decoys, or seduces by false promises, misrepresentations, or the like, any person to go out of this state, or to be taken or removed therefrom, for the purpose and with the intent to sell such person into slavery or involuntary servitude, or otherwise to employ him for his own use, or to the use of another, without the free-will and consent of such persuaded person; and every person who, being out of this state, abducts or takes by force or fraud any person contrary to the law of the place where such act is committed, and brings, sends, or conveys such person within the limits of this state, and is afterwards found within the limits thereof, is guilty of kidnaping."

While the record is not explicit, it appears that appellant had been convicted of forcibly taking a person in this state and carrying that person into some other part of the state or county—the first course of conduct proscribed by section 207. Certainly, there is no suggestion either in the record or respondent's argument before us that appellant had committed any of the other acts proscribed in section 207. On the contrary, both at trial and here, the state has relied on the use of the word "steals" in the first line of section 207 to sustain the trial court's ruling.

We are then confronted with the problem of a felony statute that forbids various acts, some of which do necessarily involve dishonesty and some of which do not. May conviction of such a felony be used for impeachment?

We are not aware of any reported case that has ruled on this issue. But it appears to us that the answer must be that the felony can be used for impeachment, assuming it is not otherwise inadmissible, if the proponent of the evidence can show that the conviction was of an act that did involve "dishonesty" as that word is used in *Spearman, supra,* 25 Cal.3d 107. We are well aware that our holding may cause further complexities in the trial of some criminal cases, a result devoutly not to be wished, but we have come to our conclusion, not by some act of divination as to what our high court may hold nor as a matter of choice among equally reasonably alternatives, but because we are ineluctably driven there by the sequence of cases from *Beagle* to *Spearman.*

We could have said that since section 207 proscribes acts which do not involve "dishonesty" a conviction thereof may not be used for impeachment. But that would deprive the state of the opportunity to show that appellant was not credible because he had been convicted of a crime that *did* go to veracity; as the high court observed: "No witness including a defendant who elects to testify in his own behalf is entitled to a false aura of veracity." (*People* v. *Beagle, supra,* 6 Cal.3d at p. 453.)

The converse is that we could have said that since section 207 does proscribe acts that involve "dishonesty," it can be used for impeachment. But since felony convictions used for impeachment are not even relevant because not probative unless they involve "dishonesty," and considering the prejudicial effect upon a jury of such evidence, it would

manifestly be unfair to the defendant if the actual crime of which he was convicted did not necessarily involve "dishonesty."

Thus, our resolution that the proponent of the admissibility of the evidence of the prior conviction should be permitted to use such evidence, provided that he can show that the conviction was relevant, i.e., that the conviction necessarily related to a crime involving "dishonesty" (assuming that the evidence meets the other criteria of admissibility of a prior felony conviction for impeachment purposes) appears to be the only solution that comports with the case law.[4]

2. ■ *Did the Trial Court Err in Giving the Standard Instruction on Expert Witnesses? (CALJIC No. 2.80.)*

Before the presentation of any evidence, the court "preinstructed" the jury and gave, inter alia, an instruction on expert witnesses. As it turned out, no witness was qualified as an expert though testimony was adduced as to the experience of the two police officers who testified.

We have examined the record and we are convinced that the jury was not misled by what turned out to be a gratuitous instruction, nor was appellant prejudiced in any respect.

3. ■ *Did the Trial Court Err in Qualifying the Circumstantial Evidence Instruction? (CALJIC No. 2.01.)*

It did but we do not deem the error to have been prejudicial.

In giving the instruction, the court limited the applicability of the instruction to a case where proof of guilt was based *solely* on circumstantial evidence. In so limiting the applicability of the instruction, the trial court erred, for the instruction should be given when circumstantial evidence is *"substantially* relied upon for proof of guilt." (*People* v. *Yrigoyen* (1955) 45 Cal.2d 46, 49 [286 P.2d 1], italics added; accord *People* v. *Wiley* (1976) 18 Cal.3d 162, 174 [133 Cal.Rptr. 135, 554 P.2d 881].)

---

[4]The problem we have discussed goes beyond section 207. Consider a conviction for burglary used for impeachment. Burglary is defined as the entering of an inhabited house, inter alia, with the intent to commit grand or petit larceny *or any felony.* (§ 459.) Entering with the intent to commit larceny would seem to necessarily be a "dishonest" act; on the other hand, entering with the intent to commit felonious assault would seem not to necessarily include an element of dishonesty.

In the case at bench, the issue was appellant's knowledge or lack thereof of the firearm in the car. The only prosecution evidence on that issue that could be considered direct evidence was the officers' testimony that appellant had admitted that the weapon had been fired or just fired. For the rest, the other prosecution evidence bearing upon appellant's knowledge was obviously circumstantial.

■ The Supreme Court in *Wiley, supra,* takes the view that an extrajudicial admission is indirect, i.e., circumstantial evidence though not of a type to which circumstantial evidence instructions are applicable, citing *People* v. *Gould* (1960) 54 Cal.2d 621, 629 [7 Cal.Rptr. 273, 354 P.2d 865]. (*Ibid.*)

We believe that the better view today is that an extrajudicial admission is direct evidence of the truth of that which is admitted. *Gould, supra,* relied on Code of Civil Procedure section 1823 and *People* v. *Koenig* (1946) 29 Cal.2d 87, 91 [173 P.2d 1] (*Koenig* was disapproved on other grounds in *Gould*). *Koenig,* recognizing that in other jurisdictions an admission was direct evidence of the truth of that which was admitted, relied solely on Code of Civil Procedure section 1823 (which read the same in 1946 as it did subsequently when *Gould* was decided), defining indirect evidence and giving as an example thereof, an admission.

However, Code of Civil Procedure section 1823 was repealed with the enactment of the Evidence Code operative January 1, 1967, and was not carried forward into the Evidence Code. Thus, since January 1, 1967, there has been no statutory basis for saying that admissions, per se, are circumstantial evidence of the truth of what was admitted.

In the absence of a statutory definition mandating otherwise, it would seem that an extrajudicial admission is as much direct evidence of what is admitted as would be an in-court admission. The only difference between the two situations is that in the former it must be proven to the trier of fact that the admission was made. That one statement is hearsay and the other not would seem to be irrelevant in the context of the distinction between direct and circumstantial evidence. ■ Thus, in the case at bench, if the jury believed the officers' testimony that appellant said he had fired the weapon, then appellant's statement was direct evidence that appellant knew of the firearm for no inference is necessary to prove that fact. (Evid. Code, § 410.)

However, appellant's admission was only circumstantial evidence of his knowledge of the presence of the firearm in the auto. From the fact that appellant knew of the gun shortly before it was found in his car, one may infer, and it is a reasonable inference, that he knew it was in the car.

We conclude that appellant's admission was direct evidence that he knew of the particular weapon but circumstantial evidence that he knew it was in his car.

Consequently, the court's instruction, though it was erroneous, could not have prejudiced him for the evidence of his guilt did rest solely on circumstantial evidence.

4. ■ *Did the Trial Court Err in Its Exegesis of the "proof beyond a reasonable doubt" Instructions? (§ 1096; CALJIC No. 2.90.)*

Yes, as we explain below.

After the jury had been out some two and one-half to three hours, the jury asked a question of the court relating to the elements of violation of section 12021. Court was convened and other questions were invited. One juror asked for directions as to "what we are supposed to judge as evidence, what is supposed to be our duty, and what is a reasonable doubt?" Other jurors expressed interest in hearing the definition of the burden of proof. The judge reread the definition as set forth in Penal Code section 1096. Another juror then asked "Would that be interpreted, then, meaning that doubt should not be based on speculation?" The court responded in the language of former CALJIC No. 22 (rev.). "The law does not require that degree of proof which, excluding all possibility of error, produces absolute certainty, for such a degree of proof is rarely possible. Moral certainty only is required, which is that degree of proof which produces conviction in the mind of an unprejudiced juror." The following colloquy ensued:

Does that answer your question?

JUROR...: Probably as well as it can.

THE COURT: You have to understand that you must decide the case on the basis of the evidence presented here in the courtroom, and not on

the basis of any guesswork or speculation—but only on the evidence presented by either side here in the courtroom.

Is that clear?

JUROR . . .: So then the doubt must arise from evidence?

THE COURT: Well, I would answer that yes, if you are saying—if your question is—what is reasonable doubt—reasonable doubt is that state of the case which, after a comparison and consideration of all of the evidence—that is the evidence introduced in the trial—after a comparison and consideration of all of the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.

Does that answer your question?

JUROR . . .: Yes.

THE COURT: All right.

The jury returned to the jury room, and the judge gave the attorneys an opportunity to object to the instructions he had given and offered to bring the jury back and correct any mistakes or oversights. Appellant's attorney attempted but failed to articulate an objection to the court's response to the question about "speculation."

The trial court made a valorous attempt to explain the concept of "proof beyond a reasonable doubt." There are occasions when the better part of valor is discretion; attempts to elucidate "proof beyond a reasonable doubt" beyond the statutory definition in section 1096 are such occasions.[5] As the United States Supreme Court observed almost a hundred years ago, "Attempts to explain the term 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury." (*Miles v. United States* (1880) 103 U.S. 304, 312 [26 L.Ed. 481, 484].)

The trial court in its amplification made two errors:

*First,* it erred in giving former CALJIC No. 22 (rev.). This instruction was based upon former Code of Civil Procedure section 1826,

---

[5]That section 1096 has its own problems in terms of comprehensibility, see *People v. Brigham* (1979) 25 Cal.3d 283, 292, (conc. opn. of Mosk, J.).

repealed in 1965. The instruction itself was removed from CALJIC with the issuance of the third edition thereof in 1970. In *People* v. *Brigham, supra,* 25 Cal.3d 283 [157 Cal.Rptr. 905, 599 P.2d 100], the Supreme Court held that it was error to give this instruction. Further, the court held explicitly that its holding in this regard "should be applied retroactively only to cases whose judgments have not become final as of the date on which this opinion becomes final." (At p. 292, fn. 15.) Consequently, the holding applies to this case.

*Second,* the trial court misled the jury by telling it that the "doubt must arise from the evidence" for the "reasonable doubt prescribed by the statute may well grow out of the lack of evidence in the case as well as the evidence adduced." (*People* v. *Simpson* (1954) 43 Cal.2d 553, 566; see also *Johnson* v. *Louisiana* (1972) 406 U.S. 356, 360 [32 L.Ed.2d 152, 158, 92 S.Ct. 1620].)

■ The question now remains whether the error was prejudicial and the judgment must be reversed.

Before we can answer that question, however, we must determine by what standard we measure the prejudicial effect of the error, i.e., (1) it is not "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error" (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]); (2) the state must show and "the [appellate] court must be able to declare a belief that it was harmless beyond a reasonable doubt" (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 711, 87 S.Ct. 824, 24 A.L.R.3d 1065]); and (3) the error is reversible per se.

■ It has been unquestioned since *In re Winship* (1970) 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068], that "the Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" (*Jackson* v. *Virginia* (1979) 443 U.S. 307 [61 L.Ed.2d 560, 571, 99 S.Ct. 2781, 2787], accord *Sandstrom* v. *Montana* (1979) 442 U.S. 510 [61 L.Ed.2d 39, 48, 99 S.Ct. 2450, 2457].)

Further, in *Jackson,* the court said: "...*Winship* presupposes as an *essential* of the due process guaranteed by the Fourteenth Amendment that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince

a trier of fact beyond a reasonable doubt of the existence of every element of the offense." (*Id.*, at p. 316 [61 L.Ed.2d at p. 571], italics added.)

Again, in *Jackson,* the court hypothesized that if a jury were instructed that proof by a preponderance of the evidence was sufficient to convict, even though the proof of guilt had been overwhelming, such a conviction would be a denial of due process. (*Id.*, at p. 320, fn. 14 [61 L.Ed.2d at p. 574].)

It appears, therefore, that where the jury is instructed as to a standard of proof substantially lower than proof beyond a reasonable doubt, regardless of the strength of the evidence against the defendant, it is reversible error per se.

■ In the case at bench, the errors in the instruction do not reach the degree of the hypothesized error in *Jackson.* ■ Not all error of constitutional magnitude is reversible per se. The California Supreme Court has held that a denial of due process under the Fourteenth Amendment is not reversible error per se unless "the trial was fundamentally unfair." (*People* v. *Bostick* (1965) 62 Cal.2d 820, 824 [44 Cal.Rptr. 649, 402 P.2d 529], see also *Chapman* v. *California, supra,* 386 U.S. 18, 21-23 [17 L.Ed.2d 705, 708-710].)

■ Because the errors did dilute to some degree the federal constitutional standard of proof beyond a reasonable doubt, it would seem that the record would have to show that beyond a reasonable doubt the error was harmless, i.e., the *Chapman* test, but we are not free to so hold.

In *Brigham, supra,* 25 Cal.3d 283, our high court explicitly held that the error in giving former CALJIC No. 22 (rev.) was to be measured by the *Watson* test. (*People* v. *Brigham, supra,* 25 Cal.3d at p. 292.) We are bound to follow that holding. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937].)

Our examination of the record convinces us that it is not reasonably probable that in the absence of (1) the error relating to the use of the kidnaping prior for impeachment, and (2) the errors relating to the instruction on proof beyond a reasonable doubt, a result more favorable to appellant would have resulted. The evidence against appellant is too powerful to hold otherwise. On the other hand, we are constrained to

observe that, if we were to measure the effect of the errors by the *Chapman* test, without going into the reasons therefor, we might have reached another conclusion as to whether the errors require a reversal of the judgment.

The judgment is affirmed.

White, P. J., and Scott, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 14, 1980.