[No. F003478. Fifth Dist. Oct. 16, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTHONY ZATARAY, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II and III.

## Counsel

Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, and Antonia D. Radillo, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, James T. McNally, Edmund D. McMurray and Thomas Y. Shigemoto, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**BROWN (G. A.), P. J.**—Anthony Zataray was convicted by a jury of murder in the second degree (Pen. Code, §§ 187, 189)[1] and of having personally used a firearm in the commission of the offense (§ 12022.5). He appeals from the judgment.

Appellant moved to exclude use of two 1981 convictions of prior felonies for impeachment—a kidnaping (§ 207) and an automobile theft (Veh. Code, § 10851). The motion was denied. Notwithstanding the denial, appellant testified in his own defense and was impeached with the two priors. The principal issue in this case is whether under *People* v. *Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111] the impeachment constituted reversible error. We conclude it does not.

### Facts

At approximately 5 p.m. on June 7, 1983, the victim, Greg Walker, accompanied by two friends, went to the house of Robert Silsby, another friend. Though Walker did not appear to be intoxicated, Silsby could smell alcohol on his breath, and his eyes were red. The group went to the park for a while and then, after an unsuccessful attempt to purchase some beer (they were under age), returned to Silsby's house. It was about 6:30 p.m. when Silsby got home. Walker waited outside while Silsby ate dinner. After dinner, Silsby borrowed his father's pickup and drove Walker to his house; the two then proceeded to the home of Walker's good friend, George Morales.

Walker went inside Morales' home while Silsby waited outside in the truck. After fifteen minutes to one-half hour later, Walker came out of the

---

[1]All statutory references are to the Penal Code unless otherwise indicated.

house and told Silsby that Morales' wife had just had a baby and that Morales had left to go to the store. The two waited outside for Morales to return. Fifteen minutes to one-half hour later Morales returned home. Silsby waited in the truck while Walker went inside. Walker had two drinks of whiskey and received some cigars.

Morales testified that when he saw Walker at this time Walker did not appear to be drunk but did appear to be high on something and intoxicated.

A number of persons in addition to Walker, including appellant, were visiting Morales at this time.

Walker stayed for about 10 to 15 minutes and then returned to the truck where Silsby was waiting. The two proceeded to Walker's parents' house where they watched television and talked to Walker's father. About one-half hour later they left the house and smoked some cigars out front. After another one-half to one hour passed, the men headed for the liquor store and found someone (Walker and Silsby were minors) to buy them a six-pack of beer. They returned to Walker's house and drank the beer.

After they had consumed the beer,[2] around midnight Silsby decided to go home and, upon Walker's request, Silsby gave Walker a ride to the Morales' house. Silsby thought Walker appeared intoxicated and was "feeling good" or "high." When the men arrived at the Morales' residence, Silsby parked the truck on the left side of the street a little beyond the house.

In the meantime, everyone but Morales and appellant had left the Morales' residence. Morales was a good friend of appellant. Morales had fallen asleep on the living room couch, and appellant was sitting on the floor "nodding off." Appellant had consumed approximately one-half bottle of whiskey and as much as a case and a half of beer that evening. In Morales' opinion, appellant was "drunk." Prior to nodding off, Morales and appellant had been playing cards. Appellant was weaving and having trouble holding onto the cards and focusing on the game. He did not walk straight, and his actions were slow and deliberate.

When Walker and Silsby arrived at the Morales house, Walker exited the truck while Silsby remained in the truck listening to the radio. What occurred thereafter is subject to conflicting recollections.

---

[2]By this time Walker had consumed approximately three to four beers over about one hour's time.

According to Silsby, when Walker exited the truck dogs were barking "like mad."[3] Silsby did not see the dogs, but it sounded like the noise was coming from the front of the house. Silsby heard Walker call out Morales' name two or three times in a normal voice, loud enough to be heard inside the house. Walker was standing about 10 feet behind the truck. Silsby did not know whether Walker had walked up the sidewalk to the front door of the house or whether Walker knocked on the door. (According to appellant, there was pounding on the door, awakening him and Morales.) Walker received no response and started walking back to the truck when the door of the house opened and a light went on. Someone, later identified as appellant, asked Walker what he wanted. Walker responded that he wanted to talk to Morales. Appellant told Walker that Morales was asleep and to go home and come back tomorrow. Walker said "all right" and began walking toward the truck. The next thing Silsby heard was a shot. Looking in his rear view mirror, he saw Walker's hand go up and his body fall forward.

Frightened and in a state of shock, Silsby slouched down in his truck. Within a minute or two, someone, later identified as Morales, opened the passenger side door of the truck and put Walker inside. Silsby testified that someone else held a gun to his head. According to Silsby, no one said anything to him.

Silsby drove Walker to Walker's parents' house. He checked to see if Walker was breathing, and he was not. He then took Walker out of his truck, laid him on the lawn, knocked on the door, and, fearing he was being followed, quickly drove away and went to the house of a friend, Robert Morgan. Silsby told Morgan what had happened, and Morgan called an ambulance and Walker's mother.

George Morales testified to a slightly different version of what occurred. According to Morales, he and appellant were awakened at approximately 11:30 or 12 that night by a pounding on the door. Morales heard the dogs barking on the side of the house. Appellant arose to answer the door. After appellant opened the door, Morales' neighbor's dog also began to bark. Morales got up, and as he was walking through the kitchen he heard a shot. He had not heard any voices. When Morales reached the front door, appellant passed through, telling him that someone had tried to come in as he was opening the door and that he took off running, "so I threw a shot."

Morales went outside and found Walker lying motionless on his back in the street about six or seven feet behind Silsby's truck. He could see Walk-

---

[3]Morales had two watchdogs which he kept in the front yard. According to Morales, however, for some reason the dogs were not there that night.

er's body as he was coming through the front door. Morales picked Walker up and put him inside Silsby's truck on the passenger side. At this point he recognized Silsby and told him to take Walker to the nearest hospital. Silsby said he was going to take Walker to St. Agnes. Morales responded that Community Hospital and Valley Medical Center were closer, and then shut the truck door. Morales was not sure whether appellant came out to the street when Morales was putting Walker inside the pickup. His recollection at trial was that appellant stayed at the location approximately 10 feet from the front door.

After Silsby drove away, Morales got his car started (it was malfunctioning) and began looking for Walker. He checked the hospitals, and then drove past Walker's house where he saw police officers out front. Morales proceeded to a friend's house where he called Walker's home and spoke to his brother. He then went to Walker's house where he spoke to Detective Moralez, telling him what had transpired. Detective Moralez accompanied Morales back to Morales' house; appellant was no longer there. However, about five minutes after the officer and Morales arrived, appellant telephoned. Morales told appellant that the officer was there and admitted telling the officer that appellant was responsible for the shooting. Appellant hung up and called back a few minutes later, this time speaking to Detective Moralez. Appellant agreed to turn himself in between 6 and 8 a.m. and admitted that he was the man who shot Walker. The call was traced, and the officers proceeded to appellant's location.

The officers found appellant outside a residence, leaning against his car as if he was waiting for someone. He informed the officers that he was the person they wanted and, without being asked, told the officers the location of the gun—inside the car. Appellant was cooperative, did not resist arrest, and did not display symptoms of intoxication.[4]

An autopsy on Walker revealed a single gunshot wound in the back of his neck as the cause of death. He was shot from a distance of two feet or greater. He had a blood alcohol content of 0.12 percent by weight and a cocaine content of 0.26 milligrams per liter of blood.

After appellant was arrested, at approximately 5:05 a.m., appellant's blood was drawn, and it revealed a blood alcohol content of 0.17 percent by weight. Toxicologist Bill Posey testified concerning the effect of high

---

[4]After leaving the Morales house, appellant called Donna Martinez at about 2 or 3 a.m. and later at about 4 a.m. went to her house and asked to use the phone. He told her he shot "Some white guy." When she asked why, he responded either "It didn't matter," she "didn't need to know," or "No reason." Appellant did not appear drunk to Ms. Martinez. Appellant was arrested outside Ms. Martinez' residence.

levels of alcohol on chronic and acute drinkers. Mr. Posey testified that alcohol affects the motor skills of all drinkers, both acute and chronic, within certain parameters. The psychological effects of alcohol, however, are better controlled by chronic drinkers. Alcohol can cause a person to become more aggressive and confident and less responsive to proper social behavior.

Dr. Levy, a psychiatrist, testified for the defense. Dr. Levy testified to the psychological and physiological effects of alcohol and cocaine. Dr. Levy explained the combination of a .20 percent blood alcohol level and .25 milligrams per liter of cocaine (comparable to the levels found in Walker) was likely to produce mental confusion and bizarre behavior.

Dr. Levy testified a person with a blood alcohol level of .15 to .20 (comparable to the levels found in appellant) would experience impairment in the thinking and perception processes. He would tend to act impulsively and irrationally, without giving due consideration to the consequences of his action. Placed in a situation where one might normally experience fear and apprehension, such as when a person hears a pounding on the door in the middle of the night, a person with a blood alcohol level of .17 or higher could misinterpret the situation as especially harmful to him.

### The Defense

Appellant testified to his version of the events that transpired. He testified that he first had contact with Morales at approximately 4 or 5 p.m. when he met Morales at the hospital after the birth of Morales' son. The two then went to the Morales home where appellant began drinking. Starting at 6 p.m., appellant consumed something more than 12 beers, tequilla and whiskey.

Appellant testified that he had seen Walker two or three times prior to the shooting, but did not recall Walker being at the Morales' residence before the shooting.

At approximately 9 or 10 p.m., all visitors except himself had left the Morales residence. Appellant and Morales played cards and watched television until they both began to fall asleep. Appellant was almost asleep when he heard a knocking or pounding at the door. He got up, went to the kitchen, and for some unknown reason picked up a gun that Morales kept on top of the refrigerator.[5] Appellant went to the door and asked who it was, but received no response. With the gun in his pocket, he opened the door, stepped outside, and began calling for Morales' dog, King. As he was walk-

---

[5]Morales kept two loaded guns on top of the refrigerator.

ing around the lawn looking for King, appellant saw a person, later identified as Walker, standing approximately 10 to 15 feet away. Walker asked for Morales, and appellant responded that Morales was asleep. As appellant began walking back toward the door, Walker again asked for Morales. Appellant observed Walker looked "loaded" or "high"; he was loud, yelling for George, pacing up and down and gesturing with his arms. Appellant again told Walker to leave, and Walker kept yelling, cursing and pacing. At this point Walker was about 10 to 15 feet away from appellant. Appellant pulled the gun out of his pocket. He cocked the gun and again told Walker to leave when the gun went off accidentally. Appellant testified he cocked the gun because he wanted to scare Walker. He never intended to shoot him.

Prior to trial, after full *Miranda* warnings, appellant gave several versions of how the shooting occurred. One version was that he jumped and the gun went off; he also said he pulled the gun's slide mechanism back and it went off. During another interview, appellant explained that he meant to shoot only a warning shot over Walker's head.

When asked if Walker's back was turned to him when the gun went off, appellant responded, "Oh, I don't think so, I don't think so, I knew he didn't have his back turned toward me." However, the autopsy showed the single bullet fired entered the back of the deceased's neck.

DISCUSSION

PART I

*Admission of Prior Convictions for Impeachment*

Appellant moved the trial court to exclude two 1981 felony convictions, one for kidnaping (§ 207) and one for automobile theft (Veh. Code, § 10851). The motion was denied. Apparently as a matter of tactics appellant's counsel brought out the two prior convictions at the close of the prosecution's case. Appellant took the stand and testified fully regarding his version of the facts. ▮▮▮ Appellant urges the trial court prejudicially erred in failing to exercise its discretion in denying his motion to exclude the prior convictions for impeachment purposes.

▮▮▮ Whether a prior felony conviction is admissible for impeachment is conditioned first upon a finding that the felony involved moral turpitude and, second, upon a finding that the probative value of admitting evidence of the prior conviction outweighs its prejudicial effect. (*People v. Castro, supra,* 38 Cal.3d at pp. 312-314.)

In *People* v. *Castro, supra,* the California Supreme Court equated moral turpitude with "readiness to do evil." (*Id.,* at p. 314.) "It is from that general disposition alone that the jury is asked to infer a readiness to lie in a particular case, and thence that he has lied in fact." (*Id.,* at p. 314.) The court further explained, while "it is easier to infer that a witness is lying if the felony of which he has been convicted involves dishonesty as a necessary element than when it merely indicates a 'bad character' and 'general readiness to do evil[,]' . . . a witness' moral depravity of any kind has some 'tendency in reason' (Evid. Code, § 210) to shake one's confidence in his honesty." (*Id.,* at p. 315.)

█ In regard to appellant's prior conviction for auto theft, even under the more narrow standard for admissibility set forth in *People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1] and its progeny, auto theft was admissible for impeachment purposes as a crime involving dishonesty. (*People* v. *Hunt* (1985) 169 Cal.App.3d 668, 674 [215 Cal.Rptr. 429]; *People* v. *Buss* (1980) 102 Cal.App.3d 781, 783 [162 Cal.Rptr. 515].) Since "all priors which necessarily involve dishonesty under the pre-*Castro* standards ipso facto involve moral turpitude under *Castro*" (*People* v. *Parrish* (1985) 170 Cal.App.3d 336, 349 [217 Cal.Rptr. 700]), the auto theft prior conviction clearly involves moral turpitude. (*People* v. *Hunt, supra,* 169 Cal.App.3d at p. 674.)

█ Simple kidnaping in violation of section 207, however, is a felony which does not necessarily involve dishonesty.[6] Thus we must, as *Castro* instructs, look to see if the "least adjudicated elements of the conviction" necessarily involve a readiness to do evil. (*People* v. *Castro, supra,* 38 Cal.3d at p. 317.)

█ Simple kidnaping is the "forcible or fraudulent stealing or abduction of another person." (§ 207; 1 Witkin, Cal. Crimes, Crime Against the Person (1963) § 350, p. 321.) The gravamen of the offense is some sort of compulsion causing the victim to feel reasonable apprehension or fear. (*People* v. *De Georgio* (1960) 185 Cal.App.2d 413, 422 [8 Cal.Rptr. 295].)

---

[6]In *People* v. *McCullough* (1979) 100 Cal.App.3d 169, 175 [160 Cal.Rptr. 831], applying the pre-*Castro* standard of admissibility, the court addressed the issue of whether kidnaping " 'necessarily involves a dishonest act.' " (*Id.,* at p. 175.) The court concluded that kidnaping does not necessarily involve dishonesty but noted that section 207 does proscribe some acts that involve dishonesty. The court resolved the issue of admissibility of a kidnaping prior for impeachment purposes by concluding that the proponent of the admissibility of the kidnaping conviction should be permitted to use the prior "provided that he can show that the conviction . . . necessarily related to a crime involving 'dishonesty' . . . ." (*Id.,* at p. 178.) This resolution is contrary to the mandate of *Castro* which provides that we may not look to the underlying facts of the conviction to determine if the offense involves moral turpitude. (*People* v. *Castro, supra,* 38 Cal.3d at pp. 316-317.)

Violation of section 207 has been labeled a felony inherently dangerous to human life and found sufficiently egregious to support the application of a second degree felony-murder theory. (*People* v. *Kelso* (1976) 64 Cal.App.3d 538, 541 [134 Cal.Rptr. 364]; *People* v. *Romo* (1975) 47 Cal.App.3d 976, 989 [121 Cal.Rptr. 684].) Annotation (1975) 23 A.L.R.Fed. 480, 532, referred to in *Castro* as providing some guidance in determining which crimes necessarily involve moral turpitude, instructs kidnaping has consistently been recognized as a crime of moral turpitude which " 'grievously offends the moral code of mankind in its inherent nature.' "

■ Given the nature of the crime, it is reasonable to conclude that simple kidnaping involves "bad character" and "readiness to do evil" and thus is admissible for impeachment purposes under *Castro.*

■ Our inquiry now turns to whether the trial court exercised its discretion under Evidence Code section 352 when it admitted the prior felony convictions. ■ "The exercise of discretion under section 352 requires the trial court to determine probative value, appraise prejudicial effect and weigh one against the other. (*People* v. *Green* (1980) 27 Cal.3d 1, 25 [164 Cal.Rptr. 1, 609 P.2d 468].) In determining whether otherwise admissible evidence should be excluded, the trial court on the record must determine if its probative value is substantially outweighed by the probability that the admission will create substantial danger of undue prejudice." (*People* v. *Parrish, supra,* 170 Cal.App.3d at pp. 347-348.)

In ruling on the motion to exclude, the court stated: "THE COURT: All right. Mr. Rube, I would certainly agree with you that kidnaping does not have any connection in my mind with truth or veracity, the 10851 [auto theft] is certainly a lot closer, it's a theft taken [*sic*] offense and courts have said that certainly that has something to do with credibility, certainly we had a perjury conviction, something of that nature, obviously that would have something directly to do with honesty and veracity, we don't have that. I have to agree with Mr. Freed [Deputy District Attorney], however, that Proposition 8 is the law, the court would generally be reluctant to exercise a—its discretion and a 352 to exclude any evidence, I believe you adequately argued to the jury as to what this may have to do with credibility, and to agree with you that it does have some prejudicial effect, all evidence, I suppose does, but, I—my discussion with Mr. Freed was that he didn't feel that he had use or not to use it, I'm reluctant to have anyone use this kind of prior unless they must, I think we're all concerned of what the possible affect [*sic*] it may have on cases in appeal. In any case, Mr. Freed does want to use it and the court will permit him to use it. The court will not use his discretion under 352, and I had considered doing that and will not use his discretion." At one point, the judge said: "The [auto theft], I think, can be used for impeachment."

■ While the judge's explanatory statement lacks desirable clarity, and though it appears the judge probably thought the prior theft would be admissible under the pre-Proposition 8 standards of *People* v. *Beagle, supra,* 6 Cal.3d 441, and its progeny, it appears in referring to both offenses the judge expressly stated he would not use his discretion under section 352. As to neither prior did the judge engage in the required "on the record" determination of "probative value, appraise prejudicial effect and weigh one against the other." (*People* v. *Parrish, supra,* 170 Cal.App.3d at p. 347; *People* v. *Green* (1980) 27 Cal.3d 1, 25 [164 Cal.Rptr. 1, 609 P.2d 468].)

■ *Castro* holds that a trial court's failure to exercise its discretion in admitting prior convictions for impeachment purposes is error. Whether it is reversible error depends upon the application of the *Watson* standard of prejudice. (*People* v. *Castro, supra,* 38 Cal.3d at p. 319; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) ■ Thus we are left with the question of whether after review of the entire record it is reasonably probable a result more favorable to appellant would have occurred in the absence of the error.

In this case there is no issue of identity or alibi. Appellant was the trigger man. This was shown by appellant's extrajudicial admissions and by his own testimony in court. The only real issue in the case was whether the shooting was intentional or, as appellant testified, was accidental. On this central issue appellant testified in detail, though he was impeached by prior statements concerning his precise version of the shooting. The jury had ample opportunity to assess his version of the facts and his credibility.

Appellant was permitted to present expert and other evidence on his mental state tending to show that the shooting occurred by accident.

Appellant made a statement to Morales immediately after the shooting that he took a shot at the person who had pounded on the door and who then took off running—direct evidence that appellant intended to shoot Walker.

Furthermore, the situation at bar does not represent one in which the prosecution made repeated and unnecessary references to appellant's prior convictions, thus unfairly influencing the jury's verdict. Evidence of the convictions was elicited by defense counsel at the close of direct examination. The jury was informed that the convictions were related to the same incident. No further mention of the convictions was made until closing argument where, in contrast to belaboring the fact that appellant had suffered prior felony convictions, the prosecution merely listed the prior convictions as one of a number of elements the jury should consider in assessing cred-

ibility. The jury was properly instructed that the prior felony convictions could be used only for the purpose of determining the credibility of appellant. There is no reason to assume the jury misused this evidence or gave it undue consideration. Under the totality of the circumstances, it is not reasonably probable a result more favorable to appellant would have occurred in absence of the error.

PARTS II-III*

·　·　·　·　·　·　·　·　·　·　·　·　·　·　·　·　·　·　·　·　·

The judgment is affirmed.

Hanson (P. D.), J., and Woolpert, J., concurred.

*See footnote on page 390, *ante*.