Alonzo W. MORRIS, Jr., Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

No. 258, 2000.

Supreme Court of Delaware.

Submitted: Oct. 24, 2001.

Decided: March 28, 2002.

Reargument Denied April 29, 2002.

Clayton A. Sweeney, Jr., Esquire, Wilmington, Delaware, for Appellant.

Kim Ayvazian, Esquire and John Williams, Esquire (argued) of the Department of Justice, Dover, Delaware, for Appellee.

Before VEASEY, Chief Justice, WALSH, HOLLAND, BERGER and STEELE, Justices, constituting the Court en Banc.

VEASEY, Chief Justice.

In this case we reaffirm the principle that it is improper for prosecutors to argue that the jury may acquit the defendant only if the jury finds that the State's witnesses are "lying."[1] The trial court here

---

1. *Fensterer v. State,* 509 A.2d 1106 (Del.1986).

committed plain error by failing to intervene sua sponte and take appropriate action to cure the effect of this patently improper prosecutorial argument.

We decline to address a further aspect of this case that was raised for the first time at oral argument in this Court. That issue is whether the defendant may now, on this record, raise the bar of double jeopardy, thus preventing a retrial, on the ground that the prosecutorial misconduct was so egregious that it was plainly designed to goad the defendant into moving for a mistrial in order that the State could improve its chances of conviction on a retrial. Although in certain circumstances the double jeopardy clauses of the Fifth Amendment of the Federal constitution[2] and Article I, Section 8 of the Delaware constitution[3] may be available as a remedy for egregious prosecutorial misconduct,[4] the issue may only arise if the prosecution seeks a retrial. Thus, the issue is not ripe for consideration in this case and we decline to address it at this time.

Accordingly, we reverse the judgment below and vacate the defendant's sentence. We remand this case to the trial court for proceedings consistent with this Opinion.

### Facts

Between 7:35 a.m. and 7:40 a.m. on November 1, 1999, a man approached James Bibbins as Bibbins rode his bicycle on his way to work on North Race Street in Georgetown, Delaware. Bibbins stopped his bicycle and the man told Bibbins that he had wanted to meet him so he could beat him up.[5] The man then said that Bibbins had "disrespected" him during a phone conversation. Bibbins responded: "I don't see how I disrespected you, I didn't even talk to you." When Bibbins resumed his commute to work, the man threw a rock at him. The man then picked up a piece of pipe, ran after Bibbins, and struck him in the head with the pipe. The blow broke several bones in Bibbins' head and tore the optic nerve in his right eye. The assailant then ran away around a street corner.

A police investigation led to the indictment of Alonzo Morris, Jr. for first-degree assault and possession of a deadly weapon during the commission of a felony. At trial, the State produced two eyewitnesses who identified Morris as the person who attacked Bibbins. But Bibbins was unable to identify Morris as his assailant. Morris presented an alibi defense by testifying that, on the morning of the assault, he left his girlfriend's apartment between 7:45 a.m. and 8:00 a.m., stopped at the post office and arrived at his residence ten or fifteen minutes later. Morris' testimony was corroborated, at least in part, by the testimony of his girlfriend and that of Sergeant Ronald Brock, who testified that he saw Morris near the post office at about 8:10 a.m. on the morning of the assault.

The jury found Morris guilty of both crimes charged. The Superior Court found that the convictions violated Morris' probation. The court sentenced Morris to ten years in prison for the assault conviction, twenty years in prison for the weap-

---

**2.** U.S. Const. amend. V ("[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb; ....").

**3.** Del. Const. art. I, § 8 ("[N]o person shall be for the same offense twice put in jeopardy of life or limb.").

**4.** *See,* e.g., *Oregon v. Kennedy,* 456 U.S. 667, 676, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982)

(where governmental conduct is intended to "goad" the defendant into moving for a mistrial, a retrial may be barred on double jeopardy grounds).

**5.** According to Bibbins' testimony, the man's exact words were: "I've been wanting to meet you. I'm going to whip your gray ass."

ons conviction, and five years and three months in prison for the violation of probation. Morris appeals his sentence on various grounds, including prosecutorial misconduct.

### Morris' Claim of Prosecutorial Misconduct

Morris argues that the prosecutor made several improper statements during closing argument that undermined the fairness of his trial. Because defense counsel did not object at trial to the prosecutor's statements and the Superior Court did not intervene sua sponte, we review for plain error.[6]

■ First, Morris contends that the prosecutor misrepresented the testimony of Officer Barlow concerning the time of Barlow's arrival at Morris' residence on Douglas Street. On direct examination, Barlow testified that about thirty or forty minutes passed between the time he was "there with Mr. Bibbins" and the time he arrived at Douglas Street. He then agreed that his estimate placed him at Morris' residence at 8:10 or 8:20 a.m. On cross-examination, Barlow conceded that he may have arrived at Morris' residence at 8:30 or 8:45 a.m., but he "couldn't verify that for certain." On re-direct, the prosecutor asked Barlow:

> Q: Officer Barlow, I just want to clarify this thirty-or forty-minute time period that you estimated. Are you estimating that it was thirty or forty minutes from

the time you were actually standing there by Mr. Bibbins' side until the time you were standing at Douglas Street? Or are you saying it was thirty or forty minutes from the time that you had cleared and you were at the Georgetown station until the time you were at Douglas Street? Which would it be?

> A: I would say that it was thirty or forty minutes from the time that I was with Mr. Bibbins to the time at Douglas Street. It would seem to me ... that I went from that area back to the station, ran computer checks, then was told by the secretaries that there might be an incident up on Douglas Street, and then left from the police station and went to that. So it was a chain of events. I don't believe could have been more than forty minutes in total.

During closing argument the prosecutor summarized this testimony as follows:

> [Barlow] says it was about 30 to 40 minutes afterwards that, you know, between the time he was there by Mr. Bibbins' side and the time he was at Douglas Street talking to those other parties about the complaint, is when he saw J.R. Morris there. Well, that puts him there probably about 8:10 or 8:15.

Morris argues that this statement is improper because Barlow clarified on re-direct that the "chain of events ... began when [Barlow] was *last* with Bibbins (about 8:00 a.m.), and estimated he arrived at Douglas Street 40 minutes later."[7]

---

6. *See* Supr. Ct. R. 8; *Trump v. State*, 753 A.2d 963, 964–65 (Del.2000) (holding that the error must "be so clear and defense counsel's failure to object so inexcusable that a trial judge ... has no reasonable alternative other than to intervene *sua sponte* and declare a mistrial or issue a curative instruction"); *Robertson v. State*, 596 A.2d 1345, 1356 (Del.1991) (holding that, if not made at trial, objections to the State's rebuttal argument are deemed waived unless "substantial rights are jeopardized and the fairness of the trial imperiled"); *see also id.* at 1356 (defining plain error as "material

defects which are apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice").

7. Appellant's Op. Brief at 39 (emphasis in original). The precise chronology is important to Morris' alibi defense. If Barlow saw Morris at his home on Douglas Street at about 8:10 a.m., he could not have been across town at the post office as both he and Brock testified. If Barlow did not arrive until

Morris' argument mischaracterizes Barlow's testimony. The prosecutor asked Barlow to choose one of two options as the starting point of the chain of events: (1) "the time you were actually standing there by Mr. Bibbins' side" or (2) "the time that you had cleared" the assault scene. Barlow chose the former option and thus indicated that he was at Morris' residence at approximately 8:15 a.m., thirty minutes after he arrived on the scene of the assault on Bibbins. Because this testimony supports the prosecutor's time estimate, the prosecutor did not materially misrepresent Barlow's testimony during closing argument.

■ Morris next points to the prosecutor's characterization of Bibbins' failure to identify Morris as his assailant during the trial. On direct examination, the prosecutor asked Bibbins if he saw "the person who hit you with the pipe." Bibbins responded: "No, I don't see him." The State then presented expert testimony that, as a result of head trauma from the assault and unrelated glaucoma, Bibbins could not see out of his right eye and could not identify with his left eye facial features that are more than twelve feet away. During the State's summation, the prosecutor stated:

> [Bibbins] took that stand, he was asked if he could identify the person who hit him. He looked around out of his one eye, he stood up, and he looked around and he just couldn't. Well, have confidence in the fact—let that relate to Mr. Bibbins' credibility, that Mr. Bibbins isn't going to stand up there with his

hand on the Bible and tell you a lie. He couldn't make out the face.

During rebuttal summation, the prosecutor repeated that Bibbins "just couldn't see."

Although the prosecutor's statement does not accurately reflect Bibbins' unqualified testimony ("No, I don't see him."), the statement does find some support in the testimony of the State's expert. The prosecutor could legitimately ask the jury to infer from the expert's testimony that Bibbins' eyesight was sufficiently poor that he could not identify Morris, who was seated about twenty-four feet away at the defense table.[8] Although the prosecutor did not explicitly disclose that his statement was based on an inference drawn from the expert's testimony, the record does support the prosecutor's inference and hence the statement was not improper.

■ Second, Morris argues that, during the State's rebuttal summation, the prosecutor referred to facts not in evidence relating to whether the view of a witness was blocked. Sergeant Brock testified that, at about 8:10 a.m., he saw and waved to Morris, who was standing on a side street near the post office, as Brock drove by. The prosecutor sought to impeach Brock's testimony by contending that a two-story house would have blocked Brock's view of Morris as Brock approached the side street.[9] During cross-examination, the prosecutor, on several occasions, asked Brock about the house, but Brock did not agree that the house exists or that it blocked his view of Morris on the

about 8:30 a.m., Morris would have had sufficient time to go to the post office, see Brock, and walk home to meet Stephens before Barlow's arrival.

8. *Cf. Hooks v. State,* 416 A.2d 189, 204 (Del. 1980) ("The prosecutor in his final summation should not be confined to a repetition of the evidence presented at trial.").

9. This fact would undermine Brock's testimony because it supports the State's argument that Brock did not have time to identify and acknowledge Morris before Brock passed the side street on which Morris was standing.

morning of the assault. Brock also testified that he did not notice this house. There was no other testimony about the house blocking Brock's view. Nevertheless, during rebuttal the prosecutor stated:

I guess this whole case should hinge upon this Sergeant Brock coming up West or East Market Street driving a van.... He goes past the side street there that he estimates to be 12–feet wide. There is a big church on one corner and *there is a big house on the other corner blocking his view.* So you can't see whose [sic] coming up the street before you get to it. You can't look and see who's coming up the street after you get past him. You've got a window of 12 feet, which you're going to cover in less than a second. He looks down there and says, Alonzo, Alonzo Morris. He doesn't know whether he got dark clothing on, light clothing, whether he got glasses on. Their case certainly doesn't hinge on that testimony, ladies and gentlemen.[10]

■ The State argues that a prosecutor may properly draw "legitimate inferences of the [defendant's] guilt that flow from the evidence."[11] This is correct in the abstract, but, the prosecutor may not misrepresent the evidence presented at trial.[12] In the present case, a review of

the trial transcript indicates that the prosecutor's assertion concerning the "big house on the other corner blocking [Brock's] view" has no evidentiary support at all. Although Brock testified that there is a line of houses on the side street, he testified that he did not notice a big house on the corner that might block his view down the side street. Because there is no other evidence that the two-story house exists, the prosecutor's assertion that such a house exists and was "blocking his view" was an improper misrepresentation of the evidence. We need not decide, however, whether this misstatement standing alone would have constituted plain error because there was other prosecutorial misconduct that constitutes plain error requiring reversal.

■ Morris argues that the prosecutor improperly distorted the State's burden of proof in his closing argument:

How many liars are we going to have to have in this case for [Morris] to be not guilty? Well, you'd better be satisfied that James Bibbins is lying when he says he knows who did this to him and that it's J.R. It's J.R. Copes.[13] You'd better be satisfied that James Bynum, who's known him since he was a baby boy, that he's lying, when there has been no reason to think that James Bynum

---

10. Emphasis supplied. Morris also argues that the prosecutor improperly commented on Brock's testimony by stating that the "case certainly doesn't hinge on that testimony." Appellant's Opening Brief at 38. As a general rule, prosecutors may not express their personal opinions or beliefs about the credibility of witnesses or about the truth of testimony. *See Brokenbrough v. State,* 522 A.2d 851, 855 (Del.1987) (quoting *ABA Standards for Criminal Justice*). Although the above statement indicates that the prosecutor did not find Brock's testimony credible, the statement was not sufficiently clear to warrant sua sponte intervention by the trial court and thus did not constitute plain error. *Cf. id.* at 858–59 (finding prosecutor's remark that "I suggest to you that the document is not worth the

paper it is printed on" was "clearly improper but not plain error"); *Clayton v. State,* 765 A.2d 940 (Del.2001) (finding prosecutor's comment that a defense witness had "manipulated the truth" was improper but not plain error).

11. *Hooks,* 416 A.2d at 204.

12. *See Hughes v. State,* 437 A.2d 559, 567 (Del.1981) ("It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.") (quoting *ABA Standards, Prosecution and Defense Functions* (1971)).

13. Morris is also known as "J.R. Copes."

has any type of motive to lie against J.R. Morris....

You'd better be satisfied that Rick Hughes is lying when he identifies [Morris] as the one who hit Mr. Bibbins. You'd better be satisfied that Lenora Middleton is lying. You'd better be satisfied that Joyce Bailey is lying. For [Morris] to be not guilty, there has to be all of these amazing coincidences and all these liars....

This is a patently improper argument. In *Fensterer v. State*,[14] we held that a prosecutor may not imply that the jury has to find that the State's witnesses committed perjury, in order to acquit the defendant.[15] In finding the prosecutor's remarks improper, we observed that "[t]he jury is not required to choose between the State's and the defendant's version of the facts" and that the defendant therefore has "no affirmative burden to disprove the testimony of the [State's witnesses]."[16] In the present case, the State concedes that the prosecutor's lengthy argument on this point was "improper and unnecessary."[17] Indeed the prosecutor's improper argument that the jury may acquit Morris only if the State's witnesses were lying was egregious and patently improper under es-

tablished case law. It was inexcusable in light of *Fensterer* and, in fact, was significantly more severe than the brief statement by the prosecutor in *Fensterer*.[18]

■ We must determine next whether this prosecutorial misconduct was plain error and requires reversal of Morris' sentence and vacation of his conviction. To constitute plain error, "credibility must be a central issue in a close case" and the State's improper statements must "be so clear and defense counsel's failure to object so inexcusable that a trial judge ... has no reasonable alternative other than to intervene."[19]

This case is distinguishable from *Trump v. State*[20] where we found no reversible error. Here, unlike *Trump*, the improper statements are, indeed, "so clear and defense counsel's failure to object so inexcusable that [the trial judge had] ... no reasonable alternative other than to intervene."[21] We find that the Superior Court plainly erred by not intervening sua sponte after the prosecutor's improper argument. Thus, the first element of plain error, clear prosecutorial misconduct, has been met. We need not decide what precise remedy the trial court should have applied here had it intervened.

---

**14.** *Fensterer*, 509 A.2d at 1112.

**15.** *Cf. Hughes*, 437 A.2d at 571 ("In our opinion, 'liar' is an epithet to be used sparingly in argument to the jury. It is a flashboard more likely to create heat in a contentious courtroom than it is to illuminate the search for truth. But, more particularly, the prosecutor who labels testimony as a lie runs the risk of passing from a legitimate inference drawn from the evidence to the expression of an impermissible personal opinion. We say this because a witness or a party may be mistaken, uninformed, or erroneous in his facts or conclusions in many ways, and yet not be a liar; labeling a witness as a 'liar' or to argue that he has 'lied' is to say something quite different about his testimony.") (citations omitted). *See also* Webster's Third New International Dictionary 1305 (unabr.1986) (de-

fining "lie" as "to make an untrue statement with intent to deceive").

**16.** *Fensterer*, 509 A.2d at 1112.

**17.** State's Ans. Brief at 23.

**18.** In *Fensterer*, the prosecutor stated: "To believe the defendant and disbelieve the State, you would have to believe that [the State's witnesses] committed perjury in this case. And I would assert to you they have not." *Fensterer*, 509 A.2d at 1111.

**19.** *Trump*, 753 A.2d at 964.

**20.** *Id.*

**21.** *Id.*

We find that the prosecutorial misconduct also meets the second main element of plain error—that the misconduct attacked witness credibility which was indisputably a central issue. The combined effect of the egregious prosecutorial misconduct and the centrality of credibility compel the conclusion that the plain error standard has been met.[22]

### Whether the Prosecutor's Misconduct Creates a Bar to a Retrial of Morris Under the Double Jeopardy Clause

At oral argument on appeal in this Court, Morris claimed for the first time that, if we reverse his sentence and remand his case to the Superior Court, we must find on this appeal that a retrial is barred. Morris claims that the prosecutor intended to goad the defendant into moving for a mistrial and that we should apply the double jeopardy bar even though he did not move for a mistrial, citing the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution[23] and Article I, § 8 of the Delaware constitution[24] and *Oregon v. Kennedy*,[25] among other authorities. We asked for supplemental memoranda on this point.

■■■ Morris and the State agree that a properly presented claim that retrial is barred by double jeopardy cannot be raised unless and until the State elects to reprosecute.[26] Accordingly, the issue is not ripe and we decline to pass upon the question. Whether or not the State will seek a retrial and, if so, how the double jeopardy issue will be presented to the Superior Court and how it will rule are all, of course, unknown future events. As interesting as this issue is, we may never have to decide it. If we were to speak to the issue in this Opinion we would be expressing an advisory opinion, and that is not our proper function.[27]

### Morris' Other Claims on Appeal

We have held that the prosecutorial misconduct alone warrants reversal of Morris'

22. Again, we admonish defense counsel to object and take other appropriate action when error presents itself at trial. Counsel should not depend on this Court finding plain error. *See id* at 969–70.

23. U.S. Const. amend. V ("[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb; . . . .").

24. Del. Const. art. I, § 8 ("[N]o person shall be for the same offense twice put in jeopardy of life or limb.").

25. 456 U.S. at 676, 102 S.Ct. 2083 (1982).

26. *Bailey v. State,* 100 Nev. 562, 688 P.2d 320, 322 (1984) ("We conclude, however, that unless and until the state refiles the attempted murder charge, the double jeopardy claim is premature; accordingly, we decline to address it at this time. On remand, if the state refiles the murder charge, appellant may raise his double jeopardy claim in district court by the appropriate motion."); *cf. Sumpter v. De-Groote,* 552 F.2d 1206, 1208 (7th Cir.1977) ("On remand, Sumpter raised a timely double jeopardy objection to retrial of the sex issue."); *United States v. Conley,* 503 F.2d 520, 521 (8th Cir.1974) (refusing to consider a defense of former jeopardy raised for the first time on appeal because "constitutional immunity from double jeopardy is a personal right which if not affirmatively pleaded by the defendant *at the time of trial* will be regarded as waived") (emphasis added); *State v. Davison,* 46 S.W.3d 68, 78 n. 4 (Mo.Ct.App.2001) ("On remand, however, Mr. Davison would be able to raise this [double jeopardy] claim at any new trial.").

27. See, *e.g., Stroud v. Milliken Enterprises, Inc.,* 552 A.2d 476, 479–80 (Del.1989) ("Courts in this country generally, and in Delaware in particular, decline to exercise jurisdiction over cases in which a controversy has not yet matured to a point where judicial action is appropriate."); *Stroud v. Grace,* 606 A.2d 75, 86 (Del.1992) ("Nothing more was, or could have been, decided since to do so would have amounted to the issuance of an impermissible advisory opinion.").

sentence. In the interest of justice, however, we will address Morris' other claims made on appeal to assist the parties and the trial court in the event of a retrial.

In addition to his claim of prosecutorial misconduct, Morris asserts that the Superior Court committed reversible error in the following ways: (1) by finding that the jury had a rational basis on which to conclude that Morris assaulted Bibbins; (2) by admitting hearsay testimony regarding Bibbins' statements after the assault; and (3) by failing to balance the probative value of Morris' prior convictions for burglary and kidnapping against the potential for unfair prejudice under D.R.E. 609.[28]

### A. Whether the Jury Had a Rational Basis for Finding Morris Guilty

Morris argues that the Superior Court erred in finding that the jury had a rational basis on which to conclude that Morris assaulted Bibbins. Morris contends that the State did not produce sufficient competent evidence to prove beyond a reasonable doubt that he was the person who attacked Bibbins.[29] Morris preserved his sufficien-

cy-of-the-evidence challenge for appeal by presenting a timely motion to acquit under Superior Court Criminal Rule 29 in the trial court.[30]

The Superior Court's decision to grant or deny a motion to acquit is subject to de novo review by this Court. As a general rule, a conviction must be sustained if "any rational trier of fact, viewing the evidence in the light most favorable to the State, could find the defendant guilty beyond a reasonable doubt."[31] In denying Morris' motion to acquit, the trial court found that "there was almost overwhelming evidence of guilt." The State points to several key facts that provide a rational basis on which the jury could convict Morris for the attack.

First, although Bibbins did not make an in-court identification of Morris, two eyewitnesses, James Bynum and Richard Hughes, testified at trial that Morris was the assailant.[32] Second, immediately after the attack (and at trial), Bibbins identified the assailant as J.R. or Jerrold Copes.

**28.** Morris also claimed that the trial judge should not have permitted an expert witness to testify for the State because of late notice by the State of this proposed testimony. Our reversal here moots this issue and is not relevant to any retrial where we assume such a procedural question will not become an issue.

**29.** Morris also argues "when a defendant raises a defense of alibi, the State must [disprove the alibi] beyond a reasonable doubt." Appellant's Opening Brief at 27. As support for this proposition, Morris cites *Rogers v. State*, 343 A.2d 608, 610 (Del.1975). Morris' argument is based on a misreading of *Rogers*. The *Rogers* Court held that the trial court's instruction requiring the defendant to prove an alibi as an affirmative defense was erroneous. *See id.* Applying the appropriate standard for constitutional errors, the Court concluded that "we are satisfied beyond a reasonable doubt that the error in the charge to the jury [requiring the defendant to prove his alibi] was harmless error." *Id.* The

Court did not hold that the State was required to disprove the alibi beyond a reasonable doubt. *Cf. Craig v. State*, 457 A.2d 755, 760 (Del.1983) (suggesting that, to overcome an alibi defense, "the State must prove presence beyond a reasonable doubt").

**30.** *See Monroe v. State*, 652 A.2d 560, 563 (Del.1995) ("A claim of insufficiency of evidence is reviewable only if the defendant first presented it to the trial court, either in a motion for a directed verdict or a Rule 29 motion for judgment of acquittal.").

**31.** *Robertson*, 596 A.2d at 1355 (internal citations omitted).

**32.** Bynum testified that he identified the assailant immediately because he was already acquainted with Morris (A127–28). Hughes testified that he got a "good look" at the assailant as he ran by Hughes and identified Morris as the assailant at trial.

The State also presented evidence that Morris has been known in some situations as "J.R. Copes." Third, Bibbins testified that the assault was somehow related to a telephone call that took place while he was staying with Lenora Middleton and the attack involved Middleton's then-boyfriend. The State also presented evidence that Morris and Middleton were dating in 1998 and early 1999. Finally, Middleton testified that Morris was upset with Bibbins after Morris discovered that Bibbins had sexually assaulted Middleton.

Taken together, this evidence supports a reasonable inference that Morris attacked Bibbins, that Bibbins identified Morris by another name ("J.R. Copes"), and that Morris had a reason to attack Bibbins. This evidence was sufficient to support Morris' conviction.

### B. Whether the Superior Court Plainly Erred by Admitting Hearsay Testimony Concerning Bibbins' Statements After the Assault

At trial, the State presented the testimony of several eyewitnesses who spoke to Bibbins immediately after the assault. These witnesses testified about Bibbins' descriptions of the assailant and about his theory on the reason for the attack. For example, Rick Hughes testified that Bibbins told him that someone attacked him "because [the assailant's] girlfriend was staying with me. He called me up and cussed me out on the phone and I hung up on him." Alan Hill testified that Bibbins' told him that "some guy named J.R., they had a dispute over some girl, somebody disrespecting somebody...." Georgie

McCrea also testified that Bibbins' mentioned that the girlfriend's name was Nora.

Although trial counsel did not object to these statements, Morris now argues the statements are hearsay and do not fit within a recognized exception.[33] The State contends that the hearsay statements were admissible as a present sense impression under D.R.E. 803(1).[34]

Where a party fails to object to the admission of evidence at trial, the issue is deemed waived unless the trial court committed plain error in admitting the evidence.[35] As an initial matter, these out-of-court statements are hearsay because the State has offered the testimony to prove the truth of the matter asserted in the statements.[36] The statements are therefore inadmissible unless they fall within a recognized exception to the hearsay rule.[37]

In this case, the two most relevant hearsay exceptions are for present sense impressions and excited utterances. The present sense impression exception covers "statement[s] describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter."[38] Although the statements do not have to "be precisely contemporaneous with the triggering event[, they] must be in response to it and occur within a short time after the stimulus."[39]

Only those statements in which Bibbins describes the circumstances of the attack are admissible under the present sense impression exception. Bibbins' statements concerning his telephone con-

33. Appellant's Op. Brief at 46.

34. State's Ans. Brief at 31.

35. Supr. Ct. R. 8; D.R.E. 103(d); *Smith v. State,* 669 A.2d 1, 6 (Del.1995).

36. D.R.E. 801(c) (defining hearsay).

37. D.R.E. 802.

38. D.R.E. 803(1).

39. *Abner v. State,* Del.Supr., No. 280, 1999, Hartnett, J., 2000 WL 990973 (June 29, 2000).

versation with the assailant and the assailant's relationship with "Nora," by contrast, do not describe or explain the recent event (that is, the attack) or Bibbins' condition (for example, his injuries). As a consequence these statements are not admissible under D.R.E. 803(1) as a present sense impression.

Bibbins' statements about these earlier events are admissible under D.R.E. 803(2) as excited utterances. Under 803(2), a statement is admissible if it "relat[es] to a startling event or condition" and is "made while the declarant is under the stress of excitement caused by the event or condition." In *Gannon v. State*, we held that this exception requires the proponent to establish that: "(1) the excitement of the declarant [was] precipitated by an event; (2) the statement being offered as evidence [was] made during the time period while the excitement of the event was continuing; and (3) the statement must be related to the startling event."[40]

█ In the present case, Bibbins' made the contested statements immediately after a "startling event"—the assault. Moreover, the statements relate to the attack because they identify the assailant and identify a possible motive for the assault. There is no explicit testimony that Bibbins was "excited," but it seems clear that the statements were "induced by the shock of the event."[41]

Morris argues that the statements were not "excited utterances" because Bibbins made the statements in response to questions.[42] As Morris points out, the witnesses asked Bibbins broad questions about the attack when they first approached him.[43] Bibbins' answers were not prompted by leading questions and were often unresponsive. Although one could argue that responses to questions can never be entirely "spontaneous,"[44] we do not think that the admission of these statements under the excited utterance exception constitutes plain error. Morris can renew his objection if there is another trial and this evidence is offered by the State.

### C. Whether the Superior Court Abused its Discretion by Failing to Perform the Balancing Test of D.R.E. 609 Regarding Morris' Prior Felony Convictions

At trial, Morris testified that he had been convicted of three felonies. The State sought to cross-examine Morris on the nature of these felonies, but defense counsel objected because one of the convictions was for assault. As a compromise, defense counsel agreed to permit cross-examination concerning the burglary and kidnapping convictions, and the prosecutor agreed not to cross-examine on the assault conviction. On appeal, Morris argues that the Court was still obligated to undertake the balancing analysis described in D.R.E. 609.[45] The State argues that Morris

40. *Gannon v. State*, 704 A.2d 272, 274 (Del. 1998).

41. *Littlejohn v. State*, 219 A.2d 155, 157 (Del. 1966).

42. Appellant's Op. Brief at 47.

43. For example, Hughes testified that he asked Bibbins "What, did he try to rob you?" Similarly, McCrea asked Bibbins what happened. Hill testified that he "kept [Bibbins] talking."

44. *Whalen v. State*, 434 A.2d 1346, 1355 (Del. 1981) ("[B]ecause the statement was not spontaneous, it was not admissible as an excited utterance.").

45. Appellant's Op. Brief at 48–49. Rule 609(a) provides:
    For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted but only if the crime (1) constituted a felony under the law under which the witness was convicted, and the court determines that the probative value of admitting this evi-

waived his right to the balancing analysis by agreeing to the compromise.[46] Before we reach this waiver question, however, we must establish whether the trial court was obligated to engage in the balancing test with respect to the kidnapping and burglary convictions.

■ The trial court's decision to admit evidence of prior felony convictions is subject to review in this Court for an abuse of discretion.[47] Under Rule 609, the trial court must first determine whether the conviction involved a felony or whether the conviction involved dishonesty or false statement.[48] Rule 609(a)(1) then requires the trial court to balance the probative value and prejudice of admitting prior felony conviction, whereas Rule 609(a)(2) permits the admission of prior convictions of crimes involving dishonesty without applying the balancing test of Rule 609.[49]

In *Archie v. State*, we held that, on cross-examination seeking to impeach the defendant, the State may "inquire into the type of crime and the date and place of the convictions."[50] But, as Morris correctly points out, we assumed that admission of

this evidence would be subject to the limitations described in Rule 609, including the requirement that the trial court weigh the prejudicial effects of admitting convictions for crimes not involving dishonesty.[51]

■ In the present case, the State sought to impeach Morris by cross-examining him on his burglary and kidnapping convictions. There is some dispute whether the underlying offense on the burglary conviction was kidnapping or theft.[52] Although "prior convictions for robbery, burglary and theft clearly have been determined by this Court to be crimes involving dishonest conduct," it is unclear (1) whether kidnapping is a crime involving dishonesty and (2) whether a burglary conviction based on kidnapping, as distinct from robbery or theft, is a crime involving dishonesty or false statement.[53]

This Court has defined "dishonesty" to mean "the act or practice of lying, deceiving, cheating, stealing or defrauding."[54] Although this Court has not addressed whether kidnapping is a crime involving dishonesty, the Iowa Supreme Court has held that kidnapping does not involve "dishonesty or false statement."[55] Similarly, we find that D.R.E. 609 required the Supe-

---

dence outweighs its prejudicial effect or (2) involved dishonesty or false statement, regardless of the punishment.

46. State's Answering Brief at 23.

47. *Allen v. State*, 644 A.2d 982, 985 (Del. 1994).

48. *See Gregory v. State*, 616 A.2d 1198, 1203 (Del.1992) ("The trial court, clearly, was required to determine whether prior convictions for delivery and possession of marijuana with intent to deliver are crimes within the meaning of Rule 609 involving dishonesty or false statement.").

49. *Id.* at 1204 ("Under D.R.E. 609(a)(2) evidence of defendant's felony convictions may be admitted without balancing their prejudicial effect against their probative value only if the prior convictions involved dishonesty or false statement.") (citing D.R.E. 609(a)(1)).

50. *Archie v. State*, 721 A.2d 924, 928 (Del. 1998).

51. *Id.*

52. State's Answering Brief at 32 & n. 8.

53. *Tucker v. State*, 692 A.2d 416 (Del.1996) (holding that robbery, theft, and burglary are crimes involving dishonesty). *See also Tinnen v. State*, Del.Supr., No. 70, 1986, Horsey, J., 1987 WL 36361 (Jan. 27, 1987) (receiving stolen property conviction admissible under D.R.E. 609(a)(2)); *Paskins v. State*, Del.Supr., No. 194, 1994, Veasey, C.J., 1995 WL 120665 (Mar. 15, 1995) (holding that robbery is a crime involving dishonest conduct); *Webb v. State*, 663 A.2d 452, 461 (Del.1995) (holding that shoplifting is a crime involving dishonesty).

54. *Gregory*, 616 A.2d at 1204.

55. *State v. McKettrick*, 480 N.W.2d 52, 59 (Iowa 1992). *See also People v. Zataray*, 173 Cal.App.3d 390, 219 Cal.Rptr. 33, 38 (1985) ("Simple kidnapping in violation of section

rior Court to apply the balancing test to Morris' kidnapping conviction because it did not involve dishonest conduct.[56]

The trial transcript suggests that Morris agreed to waive the application of balancing test by agreeing to permit cross-examination on the kidnapping conviction in exchange for the State's promise not to discuss the assault conviction. But, this agreement was based on the trial court's statement that the State was entitled to question Morris as to "what the felonies were, [and] what courts they were in." The court did not indicate that admission of this evidence was subject to the Rule 609 balancing test. The Superior Court thus misstated the law set forth in *Archie* and led Morris' trial counsel to agree to the arrangement proposed by the State.[57] As a consequence, we do not think that this waiver should bind Morris in this Court.

■ Although the Superior Court abused its discretion by admitting Morris' kidnapping conviction without performing the balancing test in Rule 609, we conclude that the error did not seriously prejudice the defense and therefore is not an independent ground for reversal. Morris'

207, however, is a felony which does not necessarily involve dishonesty."); *State v. Schroff*, 3 Conn.App. 684, 492 A.2d 190, 193 (1985) (holding that kidnapping "do[es] not reflect directly on the credibility of one who has been convicted of them").

**56.** See 11 *Del. C.* §§ 783, 783A (defining kidnapping as "unlawfully restrain[ing] a person" for specific purposes).

credibility was undoubtedly at issue because, as noted earlier, only his testimony supported his alibi defense. But, the testimony of two eyewitnesses and the other circumstantial evidence of identification and motive presented at trial make it unlikely that the kidnapping conviction tainted the jury's deliberations. In the event of a retrial, we assume this issue will become moot unless the prosecutor should seek to use the kidnapping conviction again.

### Conclusion

The prosecutor at Morris' trial improperly commented that the jury could not acquit Morris unless the jury found that the State's witnesses were lying. We reaffirm that such egregious prosecutorial misconduct is reversible error, and it is plain error in a case like this where credibility of witnesses is central. Accordingly, we reverse Morris' sentence and vacate his conviction. We remand this case to the Superior Court for proceedings consistent with this Opinion.

**57.** *Archie*, 721 A.2d at 928.