# IN THE SUPREME COURT OF THE STATE OF DELAWARE

KEVIN MILLER,

  Defendant Below,
  Appellant,

  v.

STATE OF DELAWARE,

  Plaintiff Below,
  Appellee.

§
§ No. 37, 2021
§
§
§
§
§ Court Below: Superior Court
§ of the State of Delaware
§
§ Cr. ID No. 1611008842A&B
§
§
§

Submitted: November 10, 2021
Decided: January 11, 2022

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court. **AFFIRMED.**

Patrick J. Collins, Esquire (*argued*), COLLINS & ASSOCIATES, Wilmington, Delaware; *for Appellant Kevin Miller*.

Matthew C. Bloom, Esquire (*argued*), Department of Justice, Wilmington, Delaware; *for Appellee State of Delaware*.

**MONTGOMERY-REEVES**, Justice:

In 2019, Kevin Miller was convicted of first-degree murder for killing Jeremiah McDonald. Miller has filed a timely appeal, arguing that the State committed prosecutorial misconduct by (1) misrepresenting to the jury that Miller asserted at least two separate alibis for McDonald's murder and (2) interfering with his constitutional right to testify. He also claims that the Superior Court abused its discretion by admitting a witness's out-of-court statements on the grounds of forfeiture by wrongdoing.

Having reviewed the parties' briefs and the record on appeal, and after oral argument, this Court affirms the Superior Court's judgment. This Court cannot conclude that the State knew that the two alibis referred to two separate murders. Furthermore, the State's actions regarding Miller's constitutional right to testify had the effect of reinforcing his right, not interfering with it. Finally, any error by the Superior Court was harmless.

## I. RELEVANT FACTS

On the evening of July 17, 2012, Jeremiah "Farmer" McDonald was hanging out in a cul-de-sac with two women in a neighborhood then known as Brookmont Farms ("Brookmont").[1] While McDonald was talking to these two women, an

---

[1] Opening Br. 6; Appendix to the Opening Br. A304 (hereafter "A__") at 48:17-23; A305 at 49:1-4.

individual with a wolf mask approached McDonald and shot him multiple times.[2]

McDonald was pronounced dead at the scene of the shooting.[3] Although the investigation at the time produced no arrests, the New Castle County Cold Case Homicide Squad re-investigated McDonald's death in 2016.[4] That investigation lead to the arrest and indictment of Kevin "Chevy" Miller.[5]

While in prison, Miller made a series of phone calls to various individuals and asserted different alibis.[6] While on the phone with Warner Wheeler, Miller claimed that "his baby's mother Elena Vega called him at his home down near the Elkton, Maryland line in his townhouse in Frenchtown Woods" to tell him about a murder (the "Frenchtown Woods Alibi").[7] In two separate calls to Wheeler and Vega, Miller stated that when he got a call from "Gate" about a murder, he was "at a liquor store in Smyrna with his wife" (the "Smyrna Alibi").[8] The State's use of these calls is at issue in this appeal. The trial testimony or statements of the following six individuals are also relevant to this appeal: Detective Brian Shahan, James Watson, Michael Mude, Warner Wheeler, Anthony Pruitt, and Rose Miller.

---

[2] Opening Br. 10.
[3] *Id.* at 6.
[4] *Id.* at 7; A268 at 45:1-21.
[5] Opening Br. 7.
[6] *Id.* at 20.
[7] *Id.*
[8] *Id.* at 21.

## A.    Detective Brian Shahan

During the testimony of Detective Shahan, the State played several of Miller's calls from prison in which Miller asserted both the Smyrna Alibi and the Frenchtown Woods Alibi.[9]  The State presented these calls as if Miller had asserted two separate alibis for McDonald's murder:

> State: In addition to talking about witnesses, we hear in that call the defendant tell Mr. Wheeler that he was home [in Frenchtown Woods] and received calls from his wife and his baby mom, is that accurate?
>
> Shahan: Yes.
>
> . . . .
>
> State: All right.  Now, as you continued to listen to calls into the next year in 2018, *did the investigation reveal [Miller] was claiming that he was in other places when the murder happened?*
>
> Shahan: Yes.
>
> ….
>
> (Audio of phone call played to the jury)
>
> State: Who's saying that?
> Shahan: That's Mr. Miller.
> State: He says he's in the liquor store with his wife?
> Shahan: Correct.
> State: *Did we not just listen to a call before that where he said his wife called him and told him that the murder happened?*
> Shahan: Yes.
> State: So now on this call, a couple months later,

---

[9] A350 at 34:18-A351 at37:12.

4

> | | he's saying Gate called him while he's at the liquor store with his wife? |
> |---|---|
> | Shahan: | Correct. [10] |

On cross-examination, Miller's counsel asked Detective Shahan if he was familiar with the murder of an individual with the alias "Two Hundred" and if Miller had been questioned for that murder.[11] At that time, the State requested a sidebar, in which Miller's counsel claimed that he was trying to clarify that the Smyrna Alibi and the Frenchtown Woods Alibi referred to separate murders—McDonald's murder and Two Hundred's murder.[12] According to Miller's counsel, Miller had asserted the Frenchtown Woods Alibi for the murder of McDonald and the Smyrna Alibi for the murder of Two Hundred:

> | Defense: | I asked if Mr. Miller's questioned about the murder. The reason I'm doing that, your Honor, is they're trying to, when he's saying he's in Smyrna, he's talking about the Two Hundred murder, he's not talking about the Frenchtown – or the Sparrow Run murder . . . . |
> |---|---|
> | Court: | All right. Wait, start over again, start at the beginning of this, please. |
> | Defense: | The problem is this: [the State is] trying to represent that when he talks about being in Smyrna – |
> | Court: | Miller? |
> | Defense: | Miller. –as opposed to being at his home [in Frenchtown Woods], they're trying to say |

---

[10] A350 at 34:18-22; *Id.* at 35:6-10(emphasis added), 20-23; *Id.* at 36:1-10 (emphasis added).

[11] A352 at 44:6-10.

[12] A352 at 44:12-A354 at 49:14.

5

|          | he's giving two different stories. However, when he's talking about being in Smyrna, he's talking about the Two Hundred murder, the murder of Two Hundred, not the murder of Farmer. |
|----------|---------|
| Court:   | I heard the liquor store. |
| State:   | He said that, too. |
| Court:   | So it's three different places, okay. |
| State:   | Yes. |
| Defense: | Talking about being in a liquor store in Smyrna, okay, and that's the murder of Two Hundred. |
| Court:   | Okay. |
| State:   | Yes, your Honor. The State objects eliciting anything that Mr. Miller said would be hearsay. If Mr. Miller wants to take the stand and explain that, that's perfectly fine, but at this point in time the calls do not at all reference or delineate between various murders, he just says what we played, and that's what we have.[13] |

## B.    James Watson

James Watson was interviewed by the New Castle County Police in 2016 as a witness to McDonald's murder.[14] At trial, however, Watson stated that he would only testify if no one from Brookmont was in the gallery, stating "[j]ust give me the capias, then, I'm not getting on that stand in front of those people."[15] Watson was ultimately established as a recalcitrant witness, and his 2016 statement to the New

---

[13] A352 at 44:15-A353 at 46:4.
[14] A324 at 125:8.
[15] A319 at 107:10-16.

6

Castle County Police was read to the jury.[16]  In that statement, Watson alleged that on the night of McDonald's murder, he was standing in a driveway in Brookmont only three houses away from McDonald's location when he saw a man emerge from the side of the house in a wolf mask.[17]  After the man in the mask approached Watson and pointed a gun at him, Watson told the masked man to "stop playin'."[18]  After the masked man continued to point the gun at Watson, Watson ran away to the side of the house.[19]  From there, Watson watched the man in the mask walk up to McDonald and shoot him multiple times.[20]

In that interview, Watson identified Miller as the shooter, noting that while he did not see Miller's face, he recognized Miller because he grew up in Brookmont with Miller:

> Because like I'm from Brookmont, you feel what I'm sayin'?  So I've been out there my whole life so if you— if I grow up with you all my life if you walk up on me you don't got to say nothin' I know what you look like by, by the way you figures like I'm thinkin', like you know what I'm sayin' damn somebody this height, this description damn like. . . . [W]hat I seen dude I wanted to say yo' stop playin' Chevy.[21]

---

[16] A327 at 137:3-A339 at 168:19.
[17] A327 at 139:16-A328 at 141:23.
[18] A328 at 141:12-13.
[19] A328 at 141:8-23.
[20] *Id.*
[21] A330 at 149:14-23.

7

In that same interview, Watson reiterated that Miller was the shooter stating, "'I'm tellin' you I think that' person 'was Chevy. I'm tellin' you I'll bet everything.'"[22] On cross-examination, the detective reading Watson's statement confirmed that Watson did not see Miller put on the mask or take it off.[23]

### C.    Michael Mude

Michael Mude, a friend of Miller and McDonald, testified about his interactions with Miller both before and after McDonald's death. Mude stated that he once witnessed Miller and McDonald get into a verbal altercation and that, the next morning, Miller told Mude that "Farmer disrespected him the night before, and that he was going to make an example out of [Farmer] his self."[24] "[B]ad blood arose between the two men" after McDonald discovered that Miller was in a relationship with the mother of his child.[25] A few days before McDonald was shot, Miller asked Mude where McDonald lived.[26] The morning after McDonald's murder, Miller asked Mude about the shooting, prompting Mude to state, "'Why, you know, you worried about somebody see something?'"[27] In response, Miller admitted to the shooting stating, "'[n]ah. Mother f*ckers that seen me do it know better than to say

---

[22] A331 at 156:6-7.
[23] A333 at 164:21-A334 at 165:13.
[24] A416 at 93:12-A417 at 97:4.
[25] Opening Br. 8.
[26] A417 at 97:5-13.
[27] *Id.* at 100:9-A418 at 101:6.

my name, and the people that know I did it ain't going to say sh*t.'"[28]  A few weeks later, Mude ran into Miller at Wal-Mart and Miller asked why he had not seen Mude around lately.[29]  After Miller expressed that Mude's absence was starting to worry him, Mude assured Miller that he was not saying anything to anyone.[30]  Miller then threatened Mude, stating, "'I don't need to tell you, I know where your mom live.'"[31]  When Mude tried to walk past Miller in the aisle, Miller noticed Mude's tattoo in memory of McDonald, prompting the following exchange:

> [Miller] said, "I see you representing your boy there."  I said, you know, Yeah, it's my man, or whatever. [Miller] says to me, "You know, mother f*ckers be talking."  And, I said, "Man, I ain't talking to nobody, I don't really mess with nobody from around there, like I said, I just been falling back and doing my own thing."  [Miller] said, "Listen mother f*cker, you can end up just like your boy Farmer."[32]

### D.    Warner Wheeler

Warner Wheeler, a longtime resident of Brookmont, and friend of Miller, identified Miller as the shooter in his testimony.  Wheeler initially disregarded the State's subpoena to testify, claiming that he received threatening phone calls in which he was warned not to testify.[33]  In one of those calls, an unknown person told

---

[28] A418 at 101:7-9.
[29] *Id.* at 104:5-6.
[30] *Id.* at 104:4-11.
[31] *Id.* at 104:10-11.
[32] *Id.* at 104:12-22.
[33] Opening Br. 13.

him that "'karma may miss you but it will hit your kids.'"[34]  He also claimed that people in the courtroom approached his daughter, asking if he was going to testify.[35] Wheeler eventually testified after being taken into custody on a material witness warrant.[36]

In his testimony, Wheeler stated that on the evening McDonald was murdered, Wheeler was standing in the doorway of his home in Brookmont.[37]  From the doorway, Wheeler could see McDonald standing outside in the cul-de-sac talking to two women.[38]  Wheeler testified that he then saw Miller come around the corner from behind a house and yelled "'yo'" to get Miller's attention.[39]  Just as Wheeler was about to yell out Miller's name, he saw Miller put on a wolf mask so he decided to stay quiet and not get involved.[40]  He did, however, walk outside of his house to "see what [Miller] was getting ready to do."[41]  Wheeler then watched Miller approach McDonald and shoot him multiple times.[42]  After Miller ran off, Wheeler called 911.[43]

---

[34] *Id.*
[35] Answering Br. 40.
[36] Opening Br. 13.
[37] A469 at 40:2-18.
[38] *Id.* at 40:22-A470 at 41:4.
[39] A470 at 41:21-A471 at 42:23.
[40] A471 at 42:20-A472 at 43:4.
[41] A472 at 43:13-16.
[42] A473 at 44:4-A475 at 46:9.
[43] A474 at 45:13-14.

### E.    Anthony Pruitt

The State presented a video of Anthony Pruitt's 2016 statement to the police after Pruitt was unavailable to testify.[44]  During a trial conference, the State informed the court that despite having an outstanding material witness warrant and the county police spending numerous hours searching for him, Pruitt had not shown up to testify.[45]  The State detailed that through the county police's investigation, it discovered that Pruitt refused to testify because he was terrified to do so after five people showed up at his place of employment and threatened him.[46]  The State moved to admit Pruitt's prior statements under the forfeiture by wrongdoing hearsay exception.[47]  Miller's counsel objected to the admission of the evidence, arguing that the State had no evidence that Miller ever threatened Pruitt or even referred to Pruitt on prior prison phone calls, a point the State conceded.[48]

In granting the State's motion, the court held that forfeiture by wrongdoing applies to anyone who may have felt intimidated by Miller's actions: "And the wrongdoing is wrongdoing which would carry over to anybody who has been

---

[44] Opening Br. 16, 18.

[45] A432 at 3:18-A435 at 6:6.

[46] *Id.*

[47] A436 at 7:12-14.

[48] A453 at 24:1-18 ("We do have evidence that [Miller] knew Pruitt was a witness, but [defense counsel] is correct in that there are no direct threatening or even direct references to Pruitt.").

11

affected by it or may be affected by it."[49] When the State played Pruitt's statement at trial, Miller's counsel again objected to the admission of the evidence, an objection the court overruled.[50]

In the statement, Pruitt alleged that Miller spoke to him before McDonald's murder and told him to tell McDonald that "Halloween is coming early."[51]

### F.    Rose Miller

Rose Miller, Miller's wife, testified in an effort to corroborate Miller's Frenchtown Woods Alibi.[52] According to Rose Miller, at the time of McDonald's murder, Miller was living in Frenchtown Woods.[53] She testified that when she heard about McDonald's death on the evening of the shooting, she called Miller on his house phone to tell him McDonald had been shot.[54] In its rebuttal case, the State played a recording of a prison phone call between Rose Miller and Miller in which she admits to calling Miller on his cell phone, not his house phone, on the night of McDonald's murder.[55]

---

[49] A454 at 25:6-14.
[50] A613 at 184:11-A614 at 185:20.
[51] A621 at 192:13-15.
[52] Opening Br. 27-28.
[53] A745 at 118:19-23.
[54] A746 at 119:18-A747 at 120:4.
[55] Opening Br. 28; A788 at 17:11-A789 at 18:11.

## II.  ANALYSIS

Miller argues that this Court must reverse his conviction on three separate grounds: (1) the State misrepresented to the jury that Miller asserted multiple alibis for McDonald's murder; (2) the State improperly interfered with Miller's constitutional right to testify; and (3) the Court abused its discretion by admitting Pruitt's out-of-court statement on the grounds of forfeiture by wrongdoing.  Miller's arguments do not support reversal.

### A.  The State Did Not Commit Prosecutorial Misconduct

Miller asserts that the State committed prosecutorial misconduct in two ways. First, Miller argues that the State erroneously represented to the jury that Miller provided both the Smyrna Alibi and the Frenchtown Woods Alibi for McDonald's murder.[56]  According to Miller, this conduct is impermissible because the State knew that Miller proffered only the Frenchtown Woods Alibi for McDonald's murder; the State knew that the Smyrna Alibi related to the murder of another individual.[57] Second, Miller contends that the State engaged in misconduct by stating that Miller would need to take the stand in order to explain the contradictory alibis and by previewing a list of topics the State would ask Miller if he testified.[58]

Generally, when a defendant fails to contemporaneously object to

---

[56] Opening Br. 4
[57] *Id.* at 33-38.
[58] *Id.* at 31.

prosecutorial misconduct, the right to raise the issue on appeal is waived.[59] "However, where substantial rights are jeopardized and the fairness of the trial imperiled, this Court will apply a plain error standard of review."[60] In other words, if defense counsel fails to object to alleged misconduct by the prosecutor at trial, and the trial judge does not intervene *sua sponte*, this Court reviews for plain error.[61]

This Court reviews for plain error in three steps. First, the Court reviews the record *de novo* for prosecutorial misconduct.[62] Prosecutors have a duty to "seek justice, not merely convictions."[63] Inherent in seeking justice is the responsibility to "giv[e] defendant[s] a fair and impartial trial."[64] Prosecutors must, therefore, abide by standards governing prosecution and defense established by the American Bar Association.[65] Thus, it is prosecutorial misconduct for the State to, *inter alia*, misrepresent the evidence presented at trial,[66] and interfere with a defendant's constitutional right to testify, including by engaging in actions that would render a

---

[59] Supr. Ct. R. 8; *see Robertson v. State*, 596 A.2d 1345, 1356 (Del. 1991) (citing *Ray v. State*, 587 A.2d 439, 443 (Del. 1991); *Weber v. State*, 547 A.2d 948, 960 (Del. 1988)).
[60] *Stansbury v. State*, 591 A.2d 188, 191 (1991).
[61] *Baker v. State*, 906 A.2d 139, 150 (Del. 2006); *Kurzmann v. State*, 903 A.2d 702, 709 (Del. 2006); *see Morris v. State*, 795 A.2d 653, 657 (Del. 2002) ("Because defense counsel did not object at trial to the prosecutor's statements and the Superior Court did not intervene *sua sponte*, we review for plain error.").
[62] *Kurzmann*, 903 A.2d at 708.
[63] *Brokenbrough v. State*, 522 A.2d 851, 855 (Del. 1987) (quoting *Sexton v. State*, 397 A.2d 540, 544 (Del. 1979)).
[64] *Bennett v. State*, 164 A.2d 442, 446 (Del. 1960).
[65] *Hunter v. State*, 815 A.2d 730, 735 (Del. 2002) (citing *Trump v. State*, 753 A.2d 963, 967 (Del. 2000)).
[66] *Id.* (citing *Morris v. State*, 795 A.2d 653 (Del. 2002)).

defendant's waiver of the right involuntary or coerced.[67]

If we find that no misconduct occurred, the analysis ends. If, however, we determine that the prosecutor's actions amount to misconduct, we move to the second step of the analysis, which requires an application of the standard articulated in *Wainwright v. State*.[68] Under the *Wainwright* standard,

> the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process. Furthermore, the doctrine of plain error is limited to material defects which are apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice.[69]

If we find that there is plain error under this standard, the trial court's ruling will be reversed. If not, the analysis proceeds to the third step, application of the *Hunter* standard.[70] This standard permits reversal, among other remedies, when there exists "a persistent pattern of prosecutorial misconduct," in which "'[a] repetition of the same type or category of errors adversely affects the integrity of the judicial process.'"[71]

---

[67] *Cf. State v. Reyes*, 155 A.3d 331, 341-42 (Del. 2017) ("It is clear from the transcript of the colloquy that the trial court determined that . . . Reyes understood that he had a constitutional right to take the witness stand or not take the witness stand . . . that no one had made any threats or promises to Reyes on the matter.").

[68] 504 A.2d 1096 (Del. 1986).

[69] *Id.* at 1100.

[70] *Hunter v. State*, 815 A.2d 730 (Del. 2002).

[71] *Id.* at 738.

### 1. The State did not know that the Smyrna Alibi and the Frenchtown Woods Alibi referred to separate murders

Miller argues that the State engaged in misconduct by "us[ing] out-of-context prison calls to create an impression for the jury that [] Miller told different people different alibis."[72] In other words, Miller believes the prosecutor misrepresented the evidence at trial. According to Miller, the State knew that the Smyrna Alibi and Frenchtown Woods Alibi were asserted for two different murders for two reasons.[73] First, the State knew Miller was a suspect in Two Hundred's murder.[74] Second, the context of the calls in which Miller asserts the Smyrna Alibi is different from the context surrounding the Frenchtown Woods Alibi. For example, in the Smyrna Alibi calls, Miller claims that an individual named "Gate" told him about a murder, whereas Miller claims in the Frenchtown Woods Alibi calls that his wife informed him of a murder.[75] Moreover, Miller claims that he told the same person, Wheeler, the Smyrna Alibi and the Frenchtown Woods Alibi one week apart, something he would not have done if he was referencing the murder of the same individual.[76] As such, Miller argues that these actions amount to prosecutorial misconduct. We

---

[72] Opening Br. 32.

[73] *Id.* at 33-34. Miller also argues that it was prosecutorial misconduct for the State to allege that when he said that he was in Frenchtown Woods *by* Elkton, Maryland that he was asserting a third alibi that he was in Elkton, Maryland at the time of McDonald's murder. Opening Br. 37; Reply Br. 2.

[74] A353 at 46:8-9; 47:11-13, 17-21.

[75] Opening Br. 34.

[76] *Id.*

disagree because it is not clear that the State knew the alibis referred to different murders.

First, Miller does not point to any evidence making clear that the State knew the Smyrna Alibi and the Frenchtown Woods Alibi were proffered for different murders. At most, he points to evidence that requires this Court to infer that the State knew the alibis referred to different murders, such as the context of the alibis and that he was a suspect in the murder of Two Hundred.[77] In fact, when the State asserted at trial that it did not know that the alibis referred to different murders, Miller did not dispute that claim:

> Court:    So your intent is trying to establish whether there's another investigation going on?
> Defense:    Well, what I'm trying to establish is, [the State is] trying to say that [Miller] told somebody [McDonald's murder] couldn't have been me because I was home [in Frenchtown Woods]. Then he told somebody else it couldn't have been me because I was in Smyrna. And they're two different [murders].
> State:    *But we don't know that.* And if that's what Mr. Miller is telling [his counsel], he's got to take the stand and say that.
> Defense:    Well, he will, probably.
> State:    I hope.[78]

---

[77] *Id.*
[78] A353 at 48:1-4 (emphasis added).

17

Second, the prison phone calls were, as the opening brief concedes, "rambling and jump around from topic to topic."[79] Moreover, the defense also did not dispute the State's assertion that "the calls do not at all reference or delineate between various murders."[80] In other words, it is not in dispute that Miller never clearly stated on the calls which alibi referred to which murder.

In claiming that the alibis referred to different murders, Miller has presented an alternative explanation that puts the facts of the State's assertion in dispute. But Miller did not present evidence sufficient to show that the Smyrna Alibi was asserted only in connection with Two Hundred's murder. And the State was not required to accept Miller's version of the facts. As such, we cannot conclude that the State knew the alibis referred to separate murders. Thus, we conclude that it was not prosecutorial misconduct for the State to represent to the jury that Miller had asserted both alibis for McDonald's murder.

> **2.      The State did not interfere with Miller's constitutional right to testify**

Miller also claims that the State engaged in prosecutorial misconduct by "threatening to establish [] Miller's status as suspect in that separate homicide if he were to testify."[81] In other words, after introducing the conflicting alibis, thus

---

[79] Opening Br. 33.
[80] A353 at 46:2-3.
[81] Opening Br. 31.

18

creating a situation in which Miller needed to testify to explain the contradiction, the State listed a number of detrimental topics it would address if Miller took the stand in order to "discourage [him] from testifying."[82] This, Miller contends, had the effect of interfering with his constitutional right to testify, meeting the standard for deprivation of substantial rights and manifest injustice under *Wainwright*.[83] We disagree.

Waiver of the right to testify must be "knowing, intelligent, and voluntary."[84] Although the determination of whether a defendant has made a knowing, intelligent, and voluntary waiver of his or her right to testify is fact specific, "[g]enerally, the waiver of a constitutional right will be intelligent and voluntary if the defendant is aware of the right in question and the likely consequences of deciding to forego [sic] that right."[85] Contrary to Miller's allegations, the State's action of listing "topics that would be admissible if [Miller] did take the stand," an action it took at the direction of the court, actually reinforces his constitutional right.[86] It gave him more information in order to make a knowing and intelligent decision regarding his right to testify:

---

[82] *Id.* at 38.
[83] *Id.* at 38-39.
[84] *Hall v. State*, 408 A.2d 287, 288 (Del. 1979).
[85] *Davis v. State*, 809 A.2d 565, 569 (Del. 2002) (citing *Lewis v. State*, 757 A.2d 709, 714-15 (Del. 2000)).
[86] Opening Br. 38.

State:     Our thought was, of course, it's Mr. Miller's decision and only his decision to testify, but we were discussing a number of things that we have intentionally kept out of the trial that if he testifies are going to come in and we would ask Your Honor, when you do the colloquy with him, to include some of those things *so whatever his decision is, is knowingly*.

. . . .

Court:     My instinct is that maybe we should raise these issues now with him so he knows in advance --
State:     Agreed.
Court:     -- what he might encounter, *that might help him make a decision one way or the other*.
State:     Gives him more time to think about it.
Defense:   *That's why we're doing it, so he can't say he wasn't informed of the dangers.*

. . . .

Court:     (to Miller) Mr. Miller, your attorney, Mr. Figliola, has informed the Court that you have said to him that you might want to testify. I'm not going to ask you to make a decision right now, because this is not the appropriate time for you to make the decision, but I just want you to begin thinking long and hard about some of the things that you are going to have to think about in making a decision when any defendant testifies. Beyond the obvious as to what facts you believe are relevant for your trial, the State will have an opportunity to ask questions and to impeach you. *I believe there are several areas the State would want to get into, the facts to impeach you, and you should*

20

*be aware of those things to help you make*
*your decision.*[87]

While Miller might have ultimately decided not to testify based in part on the State's information, the State's actions had the effect of giving him more data with which to better understand the ramifications of testifying. Transparency by the State is and should be encouraged. Thus, we find that the State's actions do not amount to prosecutorial misconduct.

## B.    Any Error by the Superior Court was Harmless

Miller next argues that the Superior Court abused its discretion in admitting Pruitt's out-of-court statements to police on the grounds of forfeiture by wrongdoing.[88] According to Miller, the Superior Court misapplied the forfeiture by wrongdoing doctrine in admitting Pruitt's statement because it aggregated the evidence of Miller's intimidation of other witnesses, such as Wheeler and Watson, in making a decision about Pruitt's statement, despite the fact that there was no evidence that Miller ever threatened or even referred to Pruitt.[89] As such, Miller contends that his right to confrontation was violated because he had no opportunity to cross-examine Pruitt. Miller believes that the admission of Pruitt's statement was not harmless because "[t]he statement about Halloween was very powerful in that

---

[87] A631 at 4:8-15 (emphasis added); A634 at 7:14-A635 at 8:1 (emphasis added); A638 at 11:5-20 (emphasis added).
[88] Opening Br. 41.
[89] *Id.* at 43-44.

the allegation was that [] Miller put on a wolf mask before shooting [] McDonald. This was strong evidence of premeditation and intent by [] Miller."[90]

The Court reviews the admission of evidence on the grounds of forfeiture by wrongdoing for abuse of discretion.[91] "If we conclude that there was an abuse of discretion, we must then determine whether there was significant prejudice to deny the accused of his or her right to a fair trial."[92] However, if the error in admitting the evidence was harmless, the conviction will not be overturned.[93] "An error in admitting evidence is harmless where the properly admitted evidence, taken alone, is sufficient to support a conviction."[94] The Court reviews trial court evidentiary rulings alleged to amount to constitutional violations *de novo*.[95]

The doctrine of forfeiture by wrongdoing is codified in the Delaware Rules of Evidence under Rule 804(b)(6) and permits the court to admit a statement offered against a party when that party has "engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness."[96]

---

[90] *Id.* at 45.
[91] *See Johnson v. State*, 878 A.2d 422, 425 (Del. 2005) ("We generally review a trial court's evidentiary rulings for abuse of discretion."); *Phillips v. State*, 154 A.3d 1130, 1143 (Del. 2017) ("In Delaware, a trial judge's ruling under [the forfeiture by wrongdoing] doctrine is reviewed for an abuse of discretion.").
[92] *Johnson*, 878 A.2d at 425.
[93] *Nelson v. State*, 628 A.2d 69, 77 (Del. 1993).
[94] *Howard*, 704 A.2d 278, 282 (Del. 1998) (citing *Nelson*, 628 A.2d at 77; *Johnson v. State*, 587 A.2d 444, 451 (Del. 1991)).
[95] *Johnson*, 878 A.2d at 425.
[96] D.R.E. 804(b)(6).

However, we need not and do not decide whether it was abuse of discretion for the Superior Court to admit Pruitt's statement because a holistic review of the State's case against Miller shows that any error by the Superior Court in admitting Pruitt's statement was harmless.

The State presented an overwhelming amount of evidence, excluding Pruitt's statements, against Miller that is sufficient to support his conviction. Miller was identified by Wheeler, who watched him put on a mask and shoot McDonald.[97] That identification was corroborated by a second witness, Watson, who, despite not seeing Miller put the mask on, witnessed the shooting and identified Miller as the shooter.[98] Moreover, the State presented a witness, Mude, who testified that Miller confessed to the shooting.[99] The State also established that Miller and McDonald had engaged in numerous altercations leading up to McDonald's murder, showing Miller's motive for killing McDonald.[100] Further, even if we accept Miller's assertion that the Frenchtown Woods Alibi was the only alibi to the McDonald shooting, the State presented evidence contradicting the testimony of Miller's wife in which she attempted to corroborate his location in Frenchtown Woods at the time of McDonald's murder.[101] As such, we hold that any error was harmless.

---

[97] *See supra* Section I.D.
[98] *See supra* Section I.B.
[99] *See supra* Section I.C.
[100] *Id.*; A314 at 88:5-14; A790 at 19:4-16.
[101] *See supra* Section I.F.

## III.  CONCLUSION

For the reasons provided above, the judgment of the Superior Court is affirmed.