Filed 2/27/13  P. v. Johnson CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ARLITON JOHNSON,<br><br>        Defendant and Appellant. | A131317<br><br>(Alameda County<br>Super. Ct. No. 159326) |

**INTRODUCTION**

Defendant Arliton Johnson shot and killed Tyrone Lyles and wounded Daryl Mitchell with a .9-milimeter gun on June 8, 2007.  Four days later, while still in the hospital, Mitchell gave police a statement and identified defendant as the shooter.  When police went to arrest defendant on June 14, 2007, he ran.  The police gave chase and caught him.  A loaded 45-caliber pistol dropped out of defendant's pants while he fought with a police officer.  A loaded 9-milimeter semiautomatic pistol was found in defendant's left front pants pocket after he was subdued.  At trial in 2010, Mitchell recanted his identification.  A jury convicted defendant of murder and illegal possession of a firearm by an ex-felon, but deadlocked on the attempted murder of Mitchell.

On appeal, defendant argues the trial court should have bifurcated or severed trial on the gun possession charge from trial on the murder and attempted murder charges.  He also argues the trial court violated his constitutional rights by limiting his cross-examination of the ballistics expert, and erroneously instructed and failed to instruct the jury in several respects.  He argues prejudice from cumulative error warrants reversal.

1

We find that bifurcation of the gun charge was not an option and severance was not required, and that the court did not abuse its discretion in limiting defendant's voir dire of the ballistics expert. We also find no instructional or cumulative error. Therefore, we shall affirm.

## STATEMENT OF THE CASE

In a three-count information, defendant Arliton Johnson was charged with the murder of Tyrone Lyles, and the attempted murder of Daryl Mitchell, on June 8, 2007; and with possession of a firearm by an ex-felon on June 14, 2007. (Pen. Code, §§ 187, 187/664.)[1] The information alleged that defendant personally used and intentionally discharged a firearm at Lyles and Mitchell, and personally inflicted great bodily injury on Lyles and Mitchell. (§§ 12022.5, subd. (a), 12022.53, subd. (d), 12022.7, subd. (a).) Additionally, the information alleged that the murder and the attempted murder were violent and serious felonies (§§ 1192.7, subd. (c)(8), 667.5, subd. (c)(8)), that defendant had previously been convicted of a felony that qualified as a serious felony and a strike, and that he had served three prior prison terms. (§§ 667, subd. (a)(1), 667. subd. (e)(1), 1170.12, subd. (c)(1), 667.5, subd. (b).)

The substantive counts were tried to a jury. The prior conviction allegations were bifurcated and tried to the court. On October 26, 2010, the jury found defendant guilty of second degree murder and further found he personally and intentionally discharged a firearm causing Lyles's death. The jury also found defendant guilty of possession of a firearm. The jury deadlocked on the attempted murder charge and the court declared a mistrial as to that count. The court found the prior serious felony conviction allegation true and dismissed the remaining felony conviction allegations in the interests of justice.

The court sentenced defendant to state prison for a total term of 64 years to life. Defendant timely appeals.

---

[1] Unless otherwise indicated, all statutory references are to the Penal Code.

2

## STATEMENT OF THE FACTS

On June 8, 2007, the Shotspotter acoustic gunshot detection and location system[2] recorded two gunshots from the corner of 83rd Avenue and Birch Street in Oakland, California. The first one, at 11:10:22 p.m., was at 8236 Birch Street, and the second one, 24 seconds later at 11:10:46 p.m., was at 1775 83rd Avenue. Those addresses are less than 10 feet apart. The recording of the second shot also captured the voice of Tyrone Lyles, apparently addressing the person who shot him: "Ar, Ar, why are you going to do me like that, Ar."

Tyrone Lyles died of a gunshot wound to the abdomen. Three fired casings and two fired bullets were collected at the scene of the shooting. The fired casings were .9-millimeter Luger caliber ammunition, and two of the three were fired from the same weapon. The two bullets were also .9-millimeter Luger caliber ammunition. The third casing and both bullets could have been fired from the same weapon.

Daryl Mitchell was also shot, in the shoulder, at the intersection of Birch Street and 83rd Avenue that night. At trial, he recalled that "Bink" (Lyles's nickname) was on the corner with him. He did not remember: a person approaching them on the corner; leaving and coming back again; pointing a gun at Bink, or pointing a gun at him. He remembered being shot, but not who shot him. He did not remember Bink getting shot. He did not remember giving the police a written statement or signing it and, when it was shown to him, denied ever seeing it before.

The statement was read to the jury. It said: " 'I was standing on Birch and 83rd waiting for my girlfriend when a black male short, unknown age, walked toward me from 84th. He pointed a black gun pistol at me and shot me. He then shot the other guy. I've seen the other victim in the neighborhood before. I don't know who the suspect is. He, the suspect, pointed it at the other victim, but the gun malfunctioned. I asked him if it

---

[2] Shotspotter, Inc. is a company that places and monitors microphones around the city. When a firearm is discharged, the microphones pick up the sound at different times. The company measures the difference of those times from sensor to sensor, microphone to microphone, and triangulates to within 25 meters the location of the shooting.

was a blank gun, and the suspect said, "[Y]eah." He then reloaded and shot us. He is about the same age as me, 35. I do not want to press charges if police find the suspect. I know the victim as Bink.' "

Mitchell did remember being treated at Highland Hospital for his injuries. Mitchell vaguely remembered that he was first interviewed by the police in the early hours of June 9, but he did not remember the officers' names.

Mitchell was interviewed by Sergeant Phil Green of the Oakland Police Department in the ER at Highland Hospital after midnight on the morning of June 9, 2007. Mitchell was "in a fair amount of pain and speaking very softly." He said he was on his way to visit a friend when he saw a couple of people arguing at the corner of 83rd and Birch. One of them was Bink. At some point, the person with whom Bink was arguing produced a gun. The person pointed the gun at Bink, but there was some sort of malfunction and the gun did not work. The person then picked up the round off the ground, put it back in the gun, and shot Mitchell. Mitchell began to go on Birch towards 82nd and heard more shots. He saw Bink run towards 82nd on Birch. Mitchell heard Bink say, " '[W]hy did you do me like that, Rob,' or something along those lines."

Sergeant Green interviewed Mitchell again a few days later, on June 12, 2007. Mitchell was still in the hospital, in the ICU. Mitchell was able to communicate better at this time, and Green recorded the interview with Mitchell's knowledge. Sergeant Green showed Mitchell a photographic lineup. Mitchell circled and initialed "DTM" on picture number four as depicting the person who shot him and Lyles. He initialed with his left hand because his right, or dominant, hand was incapacitated.

Mitchell's recorded statement was played in open court. In it, Mitchell said that he was standing on the corner talking with Bink, when a "dude"—the person in photo number 4—came up to them on foot and "[h]e said nothin'." He stayed a couple of minutes and left without talking to anybody. He came back again with a gun, pointed it at Bink's face and pulled the trigger. The gun—an automatic—jammed, and the man bent down and picked up the shell. Neither Bink nor the man with the gun said anything. Mitchell said, "Whatchoo doin', man. . . . Is that a real gun?" The man messed with the

4

gun, pointed it at Mitchell, and shot him in the shoulder. Mitchell walked across the street. After a little period of time, Mitchell heard "boom. He shot him, boom. The next thing you know, he was like, 'Rob or somethin' like that. 'Why you doin' like this, blood? Why you shootin' me, blood?' " Then he saw Bink get up and run towards 82nd, the same way Mitchell was going. Mitchell did not know which way the shooter went. He couldn't see and he "wasn't trippin' no more after that."

After listening to the recording, Mitchell admitted he recognized the voice as his own. But he did not remember seeing photograph number 4, or writing his initials "DTM" on it, or circling it. He testified he had never seen defendant before.

Defendant was arrested on June 14, 2007. The owner of a duplex on MacArthur Boulevard in Oakland called police to report the lower unit was supposed to be vacant, but there was somebody inside it without her permission. Oakland Police Officer Johnson knocked and announced himself, while Officer Smit went towards the rear of the residence. A man opened the door, then closed it. Officer Johnson remained at the front door, conversing with someone he couldn't see through the closed door, until the owner advised him that his partner was running down the street and through yards. Officer Johnson then went in search of Officer Smit.

As Officer Smit moved towards the back of the building, he heard a door slam and what "sounded like somebody wrestling with the fence in the backyard." He then saw an African-American man, later identified by Smit as defendant, jump over a chest-high fence and keep running. Officer Smit gave chase, never losing sight of defendant. As he ran, defendant was holding his pants up and had something in the waistband. Officer Smit eventually caught up with defendant and cornered him. While defendant and Officer Smit fought, a Colt .45 caliber gun, later found to be loaded, fell to the ground. Defendant broke free, ran, and was again caught by Officer Smit. Defendant continued to fight with Officer Smit until Officer Johnson arrived to assist and Smit was able to take defendant into custody. In a subsequent search of defendant's person, police found a small loaded .9-milimeter semiautomatic pistol in defendant's left front pants pocket. He also had money and drugs on his person.

Two of defendant's phone calls from the jail were recorded.  In a phone call on August 30, 2010 from defendant to "Jim," defendant said that trial had started and he would be going back to court "on the 13."  Asked by Jim "How's it lookin," defendant said he didn't know, "but Shante will talk to you when you get on the phone with her."  On September 14, 2010, defendant called the same number again.  An unknown woman answered and forwarded that call to a person identified as S.B.  Johnson asked S.B., "You talk to that nigga D yet?"  After defendant identified himself as "Ar" and "Arliton," S.B. said, "Oh!  What's happen?  I talked to him last night."

## DISCUSSION

### *Bifurcation*

Defendant argues the trial court erred by failing to bifurcate the trial of the gun possession charge from the trial of the murder and attempted murder charges.  Defendant acknowledges that he "finds no authority on point," but nevertheless, "submits the courts have broad authority to bifurcate (not just sever) charges under Penal Code section 1044."[3]  We disagree.  *People v. Valentine* (1986) 42 Cal.3d 170 (*Valentine*) and *People v. Sapp* (2003) 31 Cal.4th 240 (*Sapp*) prevent the trial court from using bifurcation to make an end run around Article 1, section 28, subdivision (f)(4) of the California Constitution, and both are binding on us as an intermediate appellate court.

The *Sapp* court explained:  "*Valentine, supra,* 42 Cal.3d 170, allows the trial court only two options when a prior conviction is a substantive element of a current charge:  Either the prosecution proves each element of the offense to the jury, or the defendant stipulates to the conviction and the court 'sanitizes' the prior by telling the jury that the defendant has a prior felony conviction, without specifying the nature of the felony committed.  These are the same two options the trial court here offered defendant.  Accordingly, there was no error."  (*Sapp, supra,* 31 Cal.4th at p. 262.)

---

[3] Section 1044 provides:  "It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved."

6

In our view, *Sapp* is dispositive of defendant's bifurcation claim. Putting aside the fact that defense counsel, understandably, never asked the trial court for bifurcation, the trial court correctly followed the procedure set forth in *Valentine* and *Sapp*. No error appears.

### Severance

Defendant also argues that "the factors . . . favoring bifurcation were strong enough to demand full severance as well." However, defendant did not request severance either. The trial court was not required to consider or grant severance of the felon in possession charge on its own motion.[4]

Finally, defendant argues this is a case in which, even in the absence of a motion to sever, the reviewing court may nevertheless reverse a conviction because consolidation has caused such gross unfairness to occur that the defendant has been deprived of a fair trial or due process of law. (*People v. Turner* (1984) 37 Cal.3d 302, 313, overruled on another ground in *People v. Anderson* (1987) 43 Cal.3d 1104, 1149–1150.) We disagree. Joinder was proper under section 954; murder, attempted murder and possession of a firearm by a felon all pertain to the same class of assaultive crimes (*People v. Thomas* (1990) 219 Cal.App.3d 134, 140) and were also connected together in their commission. Furthermore, the evidence against defendant was very strong: The Shotspotter system captured the victim's voice referring to defendant by his nickname, "Ar"; Daryl Mitchell identified defendant as the shooter prior to trial; defendant tried to evade arrest; when he was arrested, he was in possession of the murder weapon; and, there was evidence from which the jury could infer that from the jail defendant directed his associates to dissuade Daryl Mitchell from testifying against him. Under the circumstances, defendant was not denied a fair trial because the jury learned he had previously suffered a felony conviction.

---

[4] Defendant argues that "if more were required to perfect" his bifurcation and severance claims, counsel was ineffective for failing to do more. Given the state of the law as discussed above, defendant fails to demonstrate that counsel's performance fell below prevailing professional standards of reasonableness. (*Strickland v. Washington* (1984) 466 U.S. 668.)

7

*Limitation On Questioning Of Ballistics Expert*

Defendant argues the trial court erred by precluding "core cross-examination" of the ballistics expert, a key witness. We review the trial court's ruling on the relevance of evidence for abuse of discretion. (*People v. Kelly* (1992) 1 Cal.4th 495, 523.) During defense counsel's voir dire examination of the ballistics expert's qualifications, defense counsel asked him: "[A]s a supervisor, you review other forensic scientists' conclusions regarding tool marks, weapons, bullets and casings?" He answered, "Yes." Defense counsel then asked, "Have you ever found somebody to be in error?" The prosecutor objected on relevance grounds, and the trial court sustained the objection.

Defendant argues the question was relevant to the witness's credibility and as circumstantial evidence "regarding the underlying reliability of this subjective 'science.' " However, the purpose of this particular examination was to determine whether the witness was qualified to testify as a ballistics expert, and only tangentially whether ballistics was a proper subject for expert testimony. And, the witness's anticipated testimony concerned *his own* comparison and analysis of the ballistics evidence, not that of a subordinate under his supervision. Given the trial court's wide latitude in ruling upon relevance objections, we cannot say the court abused its discretion here.

Moreover, after the witness was qualified by the court as an expert on firearms, ammunition, and tool marks, the reliability of the science of ballistics was one of the subjects defense counsel explored during her cross-examination of the witness. The witness was asked about the national error rate of ballistics labs (one percent), and the witness's own personal error rate, which he testified was zero. The court's earlier ruling did not preclude defense counsel from asking about the error rates for subordinates under his supervision in this context.

In any event, assuming for the sake of argument the trial court erred, "generally, violations of state evidentiary rules do not rise to the level of federal constitutional error." (*People v. Benavides* (2005) 35 Cal.4th 69, 91.) This was a single objection to a single question and, even if the expert had testified that he had found somebody under him to be

in error, that answer would not have established the unreliability of ballistics, or that the expert witness himself had erred in his analysis of the evidence in this case. Defendant was not prejudiced by the court's ruling. (*People v. Cudjo* (1993) 6 Cal.4th 585, 611 [*People v. Watson* (1956) 46 Cal.2d 818, 836, applies].)

***Flight As Consciousness Of Guilt***

Over a defense objection, the trial court instructed the jury with CALCRIM No. 372, as follows: "If the defendant fled immediately *after the crime* was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself." (Italics added.) Defense counsel argued that the instruction should not be given at all, but if it was to be given, the instruction should substitute "during the arrest" for "after the crime."

On appeal, defendant argues the court erred in giving a flight as consciousness of guilt instruction because there was no factual basis for giving it. He also argues the error deprived him of due process and a fair trial because it permitted the jury to draw an irrational permissive inference of guilt of murder and improperly reduced the People's burden of proof.

"Penal Code section 1127c makes the [flight] instruction mandatory when supported by the record."[5] (*People v. Green* (1980) 27 Cal.3d 1, 39–40, fn. 26, overruled on other grounds as stated in *People v. Dominguez* (2006) 39 Cal.4th 1141, 1155, fn. 8.) Defendant maintains there was no evidence that he fled after the shooting. We disagree. Sergeant Green asked Mitchell, "[W]here did the shooter go?" Mitchell replied, "He—I don't know which way. I couldn't see. I wasn't tripping no more after that." In our

---

[5] Section 1127c provides: "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: [¶] The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine. [¶] No further instruction on the subject of flight need be given."

view, Mitchell's response implied that defendant did flee the scene, but Mitchell did not see which way he fled.

Defendant argues that a flight instruction was not warranted "merely because [defendant] left the general area of a crime." However, the jury could have inferred from Mitchell's statement that the shooter fled the scene with "a purpose to avoid being observed or arrested." (*People v. Crandell* (1988) 46 Cal.3d 833, 869 (*Crandell*), overruled on another point in *People v. Crayton* (2002) 28 Cal.4th 346, 364–365.) No more is required.

Moreover, there was undisputed evidence that defendant fled another crime scene: an apartment that did not belong to him, where he was in possession of the murder weapon, another gun, and drugs. Defendant acknowledges as much, but he argues it was irrational and unfair to permit the jury to infer from this flight evidence a consciousness of guilt of murder versus possession of firearms and drugs. He argues that "[a]ny flight activity by [defendant] *days later* said nothing about the nature or degree of his guilt, or, more specifically, about which crime(s) he was fleeing from." (Italics added.) At a minimum, he contends, the court should have limited the instruction to the count charging defendant with unlawful possession of a firearm. We disagree.

It is true the court's instruction was broad enough to allow the jury to draw—or reject—inferences of a guilty frame of mind with respect to each of the charged crimes and from either crime scene, or both. But it was not therefore erroneous. An argument similar to defendant's was rejected by our Supreme Court in *People v. Mason* (1991) 52 Cal.3d 909 in the context of the admissibility of flight evidence, and we think the court's reasoning is instructive here. In *People v. Mason*, the defendant was charged with multiple murders. In addition, evidence of uncharged crimes was also presented. The flight evidence at issue showed that the defendant fled from sheriff's deputies four weeks after the commission of one of the charged murders. Mason argued that his flight was so remote from the charged offense that it had minimal probative value, at best. The court responded: "Common sense . . . suggests that a guilty person does not lose the desire to avoid apprehension for offenses as grave as multiple murders after only a few weeks.

10

Nor do our decisions create inflexible rules about the required proximity between crime and flight. Instead, the facts of each case determine whether it is reasonable to infer that flight shows consciousness of guilt." (*Id*. at p. 941.)

Mason also argued that because the court let in the flight evidence, he was forced to admit the uncharged crimes, in order to explain the flight. Our Supreme Court also rejected that argument, observing that since the uncharged crimes were no less remote than the charged murders, the inference that the defendant fled to avoid apprehension for the charged murders was at least as strong as the inference that he fled to avoid apprehension for the uncharged crimes. Therefore, the court did not abuse its discretion in admitting the evidence. (*Id*. at p. 942.)

By parity of reasoning, the one-week delay between Lyles's killing and defendant's arrest did not make the shootings "remote" so that it was irrational or unfair for the jury to draw the inference that defendant still harbored a guilty frame of mind for the killing. That inference was at least as strong as the inference that defendant fled the police to escape capture for his possession of firearms and drugs. Since both inferences were rational, it was not error for the court to give an instruction that presented both options to the jury.

We also reject defendant's argument that the instruction deprived defendant of due process because it presented the jury with an irrational permissive inference that reduced "the People's burden of proof both on identification and the extent of his culpability." Permissive inference jury instructions are constitutional " 'so long as it can be said "with substantial assurance" that the inferred fact is "more likely than not to flow from the proved fact on which it is made to depend." ' [Citations.] If, on the other hand, the inference relieves the prosecution of its burden of proving every element beyond a reasonable doubt, then the inference violates the Due Process Clause. [Citation.] 'A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury.' [Citations.]" (*Hanna v. Riveland* (9th Cir. 1996) 87 F.3d 1034, 1037.)

11

The instruction here was permissive; it did not force the jury to draw an inference of consciousness of guilt. It merely permitted the jury to consider the evidence presented on that issue and decide whether the evidence supported such an inference as to any of the crimes charged. For the reasons we have explained above, we find the permissible inferences were not irrational, and were supported by common sense. *Hanna v. Riveland, supra*, 87 F.3d 1034, on which defendant relies, is not authority for a contrary conclusion, inasmuch as it involved an inference of recklessness in a vehicular homicide case, not an inference of consciousness of guilt from evidence of flight in a murder case.

Furthermore, we reject defendant's claim that the instruction reduced the People's burden of proof on identification for the additional reason that our Supreme Court has disapproved the view that a flight instruction should not be given when identification is an issue in the case. (*People v. Mason, supra*, 52 Cal.3d at pp. 942–943.)

Finally, we also reject defendant's claim that the instruction reduces the People's burden of proof on the extent of his culpability. Consciousness of guilt evidence goes generally to a defendant's consciousness of wrongdoing, and the instruction does not single out a particular crime, element of a crime, or degree of culpability. "A reasonable juror would understand 'consciousness of guilt' to mean 'consciousness of some wrongdoing' rather than 'consciousness of having committed the specific offense charged.' The instructions advise the jury to determine what significance, if any, should be given to evidence of consciousness of guilt, and caution that such evidence is not sufficient to establish guilt, thereby clearly implying that the evidence is not the equivalent of a confession and is to be evaluated with reason and common sense. The instructions do not address the defendant's mental state at the time of the offense and do not direct or compel the drawing of impermissible inferences in regard thereto." (*People v. Crandell, supra,* 46 Cal.3d at p. 871 [addressing CALJIC No. 2.03, "Consciousness Of Guilt-Falsehood"].) Therefore, no errors appear.

### Instruction In Response To A Jury Question

During deliberations, the jury sent the court the following question: "Please elaborate on the legal definition of the term 'intent.' Must the word intent imply that the

jury must understand what was in the shooter's mind or may conclusions be drawn based on actions alone." The court responded: "Actions alone are circumstantial evidence of intent, so I have an additional instruction that talks about circumstantial evidence as it may relate to intent which I will give you now. [¶] The People must prove not only that the defendant did the acts charged, but also that he acted with a particular intent. The instruction for each crime explains the intent required. An intent may be proved by circumstantial evidence. [¶] Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. Also, before you may rely on circumstantial evidence to conclude that the defendant had the required intent, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required intent. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions supports the finding that the defendant did have the required intent, and another reasonable conclusion supports a finding that the defendant did not, you must conclude that the required intent was not proved by the circumstantial evidence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

Defendant argues that even though the court had "every right to provide jurors with the circumstantial evidence/intent instruction it gave," nevertheless, the court's response was incomplete, misleading, and coercive of a verdict in that it (1) failed to answer the crux of the jury's question by failing to explain that jurors must understand the shooter's subjective state of mind, whether based on circumstantial evidence or otherwise; and (2) by telling the jury that actions alone are circumstantial evidence of intent. We disagree.

13

Penal Code section 1138[6] imposes on the trial court a mandatory "duty to clear up any instructional confusion expressed by the jury. [Citations.]" (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212, superseded on another point as stated in *In re Steele* (2004) 32 Cal.4th 682, 690.) "This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.]" (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.)

Here, the court gave complete instructions which, nevertheless, left a gap of understanding about the relationship of circumstantial evidence to intent. In our view, the crux of the jury's question was not about the subjectivity of intent, which the question clearly posited, but whether the shooter's subjective intent ("what was in the shooter's mind") could be inferred from the circumstances attending the shooting, or whether there must be direct evidence about it. The court's answer went to the heart of the jury's concern. It correctly identified actions as a form of circumstantial evidence and, most importantly, informed the jury about the special rules which attend the jury's consideration of circumstantial evidence and protect the defendant's right to an acquittal if there is reasonable doubt. The instruction was neutral and correct. It was not incomplete, misleading, or coercive. No error appears.

***Voluntary Manslaughter Instructions***

Defendant argues he was entitled to sua sponte instructions on the lesser included offense of voluntary manslaughter based on sudden quarrel and/or heat of passion. We disagree, because there was no evidence supportive of such instruction.

---

[6] Penal Code section 1138 provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

14

Voluntary manslaughter is the unlawful killing of another person without malice " 'upon a sudden quarrel or heat of passion.' " (Pen. Code, § 192, subd. (a); *People v. Koontz* (2002) 27 Cal.4th 1041, 1086.) Under that theory, an unlawful killing is voluntary manslaughter " '[i]f the killer's reason was actually obscured as the result of a strong passion aroused by a "provocation" sufficient to cause an " 'ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than judgment.' " ' " (*People v. Lasko* (2000) 23 Cal.4th 101, 108.) Furthermore, "[t]he provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim." (*People v. Lee* (1999) 20 Cal.4th 47, 59.)

In this case, defendant did not testify; thus, there was no direct evidence of his state of mind at the time of the shooting. The evidence on which defendant's argument relies is Mitchell's statement to police, when he was in the emergency room, that he saw "a couple [of] people arguing at the corner." One of them was Bink, and "at some point the person that Bink was arguing with had produced a gun." Mitchell also told police, when he was in the intensive care unit, that after producing the gun, defendant pointed the gun at Lyles' face and fired, but the gun malfunctioned. He bent over to pick up the shell, messed around with the gun and, when Mitchell asked him what he was doing, shot Mitchell in the shoulder. He then shot at Lyles again, this time hitting him in the abdomen.

To warrant instructions on provocation and heat of passion, there must be substantial evidence in the trial record to support a finding that the defendant's reason was actually obscured as a result of a strong passion that was aroused by the victim, and the provocation must be sufficient to cause an ordinary person of average disposition to act rashly rather than from due deliberation or reflection. In this context, "substantial evidence means evidence which is sufficient to deserve consideration by the jury and from which a jury composed of reasonable persons could conclude the particular facts underlying the instruction existed." (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 78.)

15

It does not mean " '[t]he existence of "*any* evidence, no matter how weak . . . ." ' " (*People v. Moye* (2009) 47 Cal.4th 537, 553 (*Moye*), original italics, quoting from *People v. Flannel* (1979) 25 Cal.3d 668, 685, fn. 12.)

The evidence on which defendant relies falls far short of this standard. Nothing in this scenario suggests Lyles started the argument, escalated it, or otherwise provoked defendant's mortal response, or that defendant's reason was actually obscured by a strong passion when he shot at Lyles, reloaded his malfunctioning gun, and then shot at him again. Defendant asks us to infer provocation and heat of passion from the first part of Mitchell's statement only, the complete lack of known motive, and the "very acts of shooting" which, he asserts, "reflect a rash state of mind," at least to the same degree they reflected premeditation and deliberation, on which the trial court did instruct. However, the question whether the court erred in instructing on first degree murder is not before us. On these facts, the inferences defendant posits are wholly speculative. "A trial court has a duty to instruct on general principles of law that are 'closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case.' [Citation.] But no principle of law required the trial judge below to disregard the evidence in order to find that the jury should consider whether defendant subjectively killed in the heat of passion, when no substantial evidence supported that theory of manslaughter . . . ." (*Moye, supra,* 47 Cal.4th at p. 554.) The trial court was not duty bound to instruct sua sponte on voluntary manslaughter in this case.

### Reasonable Doubt Instruction

The trial court instructed the jury on reasonable doubt in accordance with CALCRIM No. 220, as follows: "The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial. [¶] A defendant in a criminal case is presumed to be [innocent]. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt. [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding

16

conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all of the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."

Defendant argues the instruction is erroneous because it uses the phrase "abiding conviction" in the truth of the charge, and tells the jury to "compare and consider all the evidence" received at trial, even though reasonable doubt may be based on the absence of evidence. These same or similar claims have been rejected in numerous opinions. (*People v. Guerrero* (2007) 155 Cal.App.4th 1264, 1267–1269; *People v. Zepeda* (2008) 167 Cal.App.4th 25, 31–32; *People v. Flores* (2007) 153 Cal.App.4th 1088, 1093; *People v. Westbrooks* (2007) 151 Cal.App.4th 1500, 1509–1510 (*Westbrooks*).)

On the other hand, defendant has not brought to our attention any opinion which has adopted his arguments, save for *People v. McCullough* (1979) 100 Cal.App.3d 169 (*McCullough*). In *McCullough*, the trial court attempted extemporaneously to answer several questions about the elements of the crime and the meaning of reasonable doubt that the jury asked in the midst of deliberation. The court answered, in part: "You have to understand that you must decide the case on the basis of the evidence presented here in the courtroom, and not on the basis of any guesswork or speculation—but only on the evidence presented by either side here in the courtroom. [¶] Is that clear?" This prompted another juror question: "So then the doubt must arise from evidence?" The court responded: "Well, I would answer that yes, if you are saying—if your question is—what is reasonable doubt—reasonable doubt is that state of the case which, after a comparison and consideration of all of the evidence—that is the evidence introduced in the trial—after a comparison and consideration of all of the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge." (*Id.* at pp. 180–181.) On appeal, the appellate court concluded that the trial court misled the jury by telling it reasonable doubt must arise from the evidence,

17

because reasonable doubt may arise from the *lack* of evidence, but it found the error nonprejudicial under *People v. Watson, supra,* 46 Cal.2d at p. 836. (*McCullough, supra,* at pp. 182, 183.)

In *Westbrooks, supra*, 151 Cal.App.4th 1500, the court addressed and rejected an argument which, like defendant's, is based on *McCullough*. The *Westbrooks* court distinguished *McCullough,* stating: "Unlike in *McCullough,* the trial court in this case did not tell the jury that reasonable doubt must arise from the evidence presented at trial, and, given the court's other instructions, it would not have been reasonable for the jury to interpret CALCRIM No. 220 as stating that the jury was precluded from considering any perceived lack of evidence in determining [defendant's] guilt. [Citation.]" (*Westbrooks, supra,* at p. 1510, fn. omitted.) In *Westbrooks*, the trial court had instructed the jury with the same instructions given here: CALCRIM Nos. 222, 223, and 355. (*Westbrooks, supra,* at p. 1507.) The court here additionally instructed on circumstantial evidence and intent. We agree with the reasoning of the opinions which have rejected the challenges to CALCRIM No. 220 raised here and join those courts in finding that no error occurred.

*Cumulative Error*

Finally, defendant argues that the cumulative prejudice from the multiple errors committed in this case warrants reversal. We have not found multiple errors. We assumed, for argument's sake, that the trial court may have erred in sustaining an objection on relevance grounds to one question posed by defense counsel to the ballistics expert. We found that assumed error harmless. Inasmuch as there were no other errors to cumulate with the assumed error, we must reject defendant's cumulative error argument.

# DISPOSITION

The judgment is affirmed.

_____
Marchiano, P.J.

We concur:

_____
Dondero, J.

_____
Banke, J.